[No. 10663-5-I. Division One. January 30, 1984.]

LAWRENCE I. ZIPP, *Respondent,* v. SEATTLE SCHOOL DISTRICT No. 1, *Appellant.*

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S.,* and *Philip A. Talmadge,* for appellant.

*Small, Winther & Snell, P.S.,* and *Richard Weiss,* for respondent.

CORBETT, A.C.J.—The employer, Seattle School District No. 1, appeals denial of its motion challenging the sufficiency of the claimant's evidence and denial of its motion for judgment notwithstanding the verdict or for new trial.

The claimant, Lawrence I. Zipp, who is respondent on appeal, was employed by the Seattle School District as a custodian. In July 1974, while painting his house, he fell and fractured his right heel. The injury was not related to his employment. He was treated by an orthopedic surgeon and returned to work. Zipp received outpatient treatment for the injury until March 1975, at which time his physician recommended a surgical procedure known as a subtarsal or triple arthrodesis. In November 1975, while working for the school district, Zipp suffered an industrial injury. He was examined by the same physician and filed an accident report. In February 1976, the Department of Labor and Industries allowed the claim for treatment. Zipp saw his treating physician in March 1976 and declined surgery, indicating that he could live with his symptoms. About 2 weeks later, he returned to his physician, stating that his symptoms were worse and he now wished to have the surgery. The indicated surgery, arthrodesis, which had been

originally recommended in March 1975 for his broken heel, was performed in April 1976. The Department closed Zipp's claim without an award for permanent partial disability in April 1978. Zipp appealed the closure in June 1978, and subsequently underwent sural nerve surgery that same month. The hearing examiner entered a proposed decision and order affirming the Department's decision to close the claim. Zipp appealed to the Board of Industrial Insurance Appeals. In January 1980, the Board reversed the Department's order closing the claim. The Board found:

> On April 25, 1978, the claimant's right ankle condition, causally related to his November 24, 1975 industrial injury, was not fixed and he required further medical treatment.

Finding of fact 2. This finding was appealed to the superior court where the jury returned a verdict affirming the Board.

The sole issue on appeal is sufficiency of the evidence concerning the causal relationship between Zipp's industrial injury and his disability. The employer argues primarily that there was insufficient evidence to submit the case to the jury.

■ Whether or not Zipp produced sufficient evidence to withstand the motions of the employer must be tested by a stringent standard. A challenge to the sufficiency of the evidence, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits for the purpose of ruling on the motion the truth of the nonmoving party's evidence and all reasonable inferences drawn therefrom. *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 851, 586 P.2d 845 (1978). The motion requires that all evidence be interpreted in a light most favorable to the party against whom the motion is made and most strongly against the moving party. *Bennett v. Department of Labor & Indus.*, 95 Wn.2d 531, 534, 627 P.2d 104 (1981). In addition, the claim on appeal is supported by two presumptions: (1) that the findings and decisions of the Board, not having been rejected by the jury, were correct (RCW

51.52.115); and (2) that the verdict was correct. *Sacred Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 635, 600 P.2d 1015 (1979). The burden is on the employer to overcome the presumption that the findings and decision of the Board are prima facie correct. *Sayler v. Department of Labor & Indus.*, 69 Wn.2d 893, 896, 421 P.2d 362 (1966). There must, however, be substantial evidence to support the Board's findings and decision. *Jepson v. Department of Labor & Indus.*, 89 Wn.2d 394, 401, 573 P.2d 10 (1977).

■ Medical testimony must establish that it is more probable than not that the industrial injury caused the subsequent disability. *Sacred Heart Med. Ctr. v. Carrado, supra* at 636. Testimony that goes no further than to indicate that the injury might have caused the condition is insufficient; there must be some evidence of probative value that removes the question of causal relation from the field of speculation and surmise. *Jacobson v. Department of Labor & Indus.*, 37 Wn.2d 444, 451, 224 P.2d 338 (1950). If there is no evidence of causation beyond a possibility, it is error to submit the case to the jury. *Sacred Heart Med. Ctr. v. Carrado, supra* at 636; *Sayler v. Department of Labor & Indus., supra* at 896. The treating physician testified by deposition. He testified that following the industrial injury:

> He [Zipp] gave me a history at the time that he had sustained an injury to his right foot, that he had hit that foot against a chair at school and that it had given him considerable pain. It was my impression that this has aggravated his post traumatic arthritic changes . . .

He further testified that as of the date of closing Zipp's claim, April 25, 1978:

> Q As of that time do you have an opinion as to whether he was in need of further treatment as a result of his accident at school on November 24, 1975?
> A Based on the subsequent treatment that I carried out, the answer is yes.
> Q Was that the subsequent treatment—Did that consist of this sural nerve surgery?
> A Yes.

Q In your opinion was the sural nerve surgery necessary in order to reduce the disability he had?

A Yes.

Q Doctor, do you have an opinion today as to whether or not Mr. Zipp has any permanent disability involving his right foot and ankle which is attributable to or the result of the accident that he had at school on November 24, 1975 when his ankle was struck by the chair?

A He has disability as a result of the earlier injury, that is, the fracture of the heel bone, and subsequent treatment. To what extent the chair injury caused him to have his surgery I am unable to answer. It is possible that, had he not had that injury, he still might have needed surgery, but it is equally possible probably that he may not have needed surgery and the complications that developed.

\* \* \*

Q What is your opinion as to the effect or impact that this ankle injury of November 25, [sic] 1975 had on his existing condition?

A Often with any preexisting arthritic condition, when you get a further injury, the symptoms tend to persist much, much longer, and sometimes precipitate surgical treatment. . . .

\* \* \*

Q Do you have an opinion as to whether or not the school injury of November 24, 1975 aggravated or didn't aggravate his existing condition and, if so, what is your opinion?

A It did aggravate the pre–existing condition.

Q Is that what led to the surgery that you did, this subtalar arthrodesis?

A Yes.

\* \* \*

The treating physician further testified upon cross examination by counsel for the school district:

Q And in Mr. Zipp's instance it was your opinion, was it not, as late as March of 1975 that he, indeed, was experiencing symptoms of the type that would require surgical intervention and a fusion?

A Correct.

Q In fact, the only question in your mind as late as

March, 1975, was whether it was going to have to be a subtarsal fusion or whether it might have to be a triple arthrodesis?

A That is correct.

Q Looking at your note of March 19, 1975, did you not say that he "obviously needs" a subtarsal or triple arthrodesis?

A Yes.

\* \* \*

Q You would clearly be of the opinion, would you not, that he was continuing to have some symptoms?

A Yes.

Q And what would your prognosis have been if you had seen him on the 1st of November of 1975? What would your prognosis have been?

A If I had seen him on the 1st of November, '75, then my prognosis probably would have been that he may do well or he may come to surgery.

Q Let me see if I can amplify on that. You correct me if I am wrong. You would have felt at that time that he would inevitably have continued to experience some symptoms but, if he felt he could live with those symptoms, surgery would not be necessary?

A That is correct.

\* \* \*

Q When you saw him on March 10 of 1976, didn't he then say that his symptoms were such that he could live with them?

A Yes.

Q Isn't that exactly what you understood that his condition had been at the time the surgery was cancelled?

A Yes.

Q And right up until, we will say, the day before this incident that he had described involving the chair, correct?

A That would be correct.

Q He was surely having symptoms, but he had learned to adapt to them; am I right?

A Correct.

Q Then, wouldn't it follow, Doctor, that as of March 10, 1976 it would appear from what he had told you that his condition on that date was essentially the same as it had been prior to the incident involving the chair in November, 1975?

A I can't tell whether it was exactly the same, but as far as I was concerned whatever symptoms he was having—he was the person feeling the pain—his symptoms were such that he felt on March 10, 1976 that he could live with them, and to me that was reason not to advise him of any definitive treatment.

\* \* \*

Q The sural nerve involvement and the need for that surgery was most probably due to the surgical process?

A Yes.

Q And the surgery was due to the instability of the subtalar joint, is that right?

A That is right.

Q Caused by the injury of April, if that is what it was, April, 1974?

A Yes.

Q If you are right in your conclusions regarding the cause of the sural nerve involvement, then the incident that he reported in November of 1975 involving the chair was not the cause?

A In my opinion, no.

Q I understand you to say it could have been.

A It could have been.

Q Because the nerve runs in that area?

A He had pain in that area. The nerve runs in the area, but I like to think that more probably it was the result of the surgery.

Q And then you were asked if in your opinion the disability which he now has was caused by the incident involving the chair, and I think you said you would not be able to answer that question categorically, that it may all be due to the original injury and the surgery or it could have been due to the original injury and the incident involving the chair and the surgery. Have I correctly stated your position?

A Yes. Let me restate the second part of that statement, that it is possible—I can't say whether it is probable or not—that had he not had the second injury he may have gone on to live with the symptoms he was having and he may not have come to surgery and gone through the other complications that he had.

This testimony is entitled to special consideration because it is by the attending physician. *Chalmers v.*

*Department of Labor & Indus.,* 72 Wn.2d 595, 599, 434 P.2d 720 (1967). When read as a whole his testimony is ambiguous as to whether and to what extent the industrial injury was the cause of additional treatment. He did state that Zipp was in need of further treatment as a result of the industrial injury, that the industrial injury aggravated Zipp's preexisting condition, and that the industrial injury aggravated the posttraumatic arthritic changes. On the question of aggravation, the response was phrased in terms of an impression; as to the need for further treatment, they were simple "yes" responses to hypothetical questions. The hypotheticals were not expressed in terms of medical probability. Explanation of the opinions in response to questions on cross examination made clear that he was expressing them in terms of possibility rather than probability. Three other physicians testified by reasonable medical probability that neither Zipp's condition nor his need for further medical treatment was caused by the industrial injury.

The treating physician's testimony as to cause is, therefore, essential to Zipp's claim. If the treating physician repudiated his testimony by inconsistencies and contradictions, we must consider their effect. *Woods v. Department of Labor & Indus.,* 62 Wn.2d 389, 392, 382 P.2d 1014 (1963). We note the distinction between retraction of key medical testimony and lesser inconsistencies or contradictions. It is not necessary that incantatory words be used to establish the necessary causal relation between the industrial injury and the need for further treatment. The claimant need only establish the probability of a causal connection. It is only when the "verbal gymnastics" of the claimant's medical witness leave nothing of an objective nature in the record upon which the jury could reasonably rely to find the necessary causation that the challenge to the sufficiency of the evidence should succeed. *Venezelos v. Department of Labor & Indus.,* 67 Wn.2d 71, 73, 406 P.2d 603 (1965).

The questions posed to the treating physician on direct

examination were not framed in terms of medical probability. The doctor's answers are explained by and are not inconsistent with his statements on cross examination, which frame his opinion in terms of mere possibility. Without a statement of medical probability, there is nothing in the record upon which the jury could reasonably rely to affirm the finding of the Board.

In reaching this conclusion we have not given less effect to statements made on direct examination because of inconsistent statements on cross examination. The function of weighing testimony in this manner is exercised solely by the trier of fact. *Bennett v. Department of Labor & Indus., supra* at 534; *Venezelos v. Department of Labor & Indus., supra* at 73. Rather, we have searched the record for medical testimony that it is more probable than not that the industrial injury caused the subsequent disability. We find none. We note that this is not a case where evidence other than medical testimony has been presented from which a reasonable person could infer that the causal connection exists. *See Bennett v. Department of Labor & Indus., supra* at 533. The evidence concerning causation can be summed up by the testimony of the treating physician on direct examination:

> He has disability as a result of the earlier injury, that is, the fracture of the heel bone, and subsequent treatment. To what extent the chair injury caused him to have his surgery I am unable to answer. It is possible that, had he not had that injury, he still might have needed surgery, but it is equally possible probably that he may not have needed surgery and the complications that developed.

Since the record is devoid of evidence of medical probability concerning causation, the trial court erred in denying the motion to dismiss.

 Zipp also argues that based upon the treating physician's testimony, the industrial injury aggravated a preexisting condition, and thus the jury could have found a "lighting up" of the earlier condition. Here also, there is no such testimony in terms of medical probability. Addition-

ally, there is no testimony that the preexisting condition was latent or inactive, testimony that is necessary to trigger the "lighting up doctrine" as a theory of liability. *See Austin v. Department of Labor & Indus.*, 6 Wn. App. 394, 395, 492 P.2d 1382 (1971). Therefore, the jury verdict cannot be supported on the basis of this doctrine.

Reversed and remanded for entry of a judgment of dismissal notwithstanding the verdict.

RINGOLD and SCHOLFIELD, JJ., concur.

Review denied by Supreme Court June 20, 1984.