189 P.3d 178 (2008)
Cindy J. LEWIS, Respondent,
v.
SIMPSON TIMBER COMPANY, Appellant.
No. 36268-6-II.
Court of Appeals of Washington, Division 2.
May 6, 2008.
Publication Ordered July 15, 2008.
*182 Schuyler Tryon Wallace Jr., William Alexander Masters, Wallace Klor & Mann PC, Lake Oswego, OR, for Appellant.
Douglas Peter Wyckoff, Williams Wyckoff & Ostrander PLLC, Olympia, WA, for Respondent.
Debra M.H. Tollefson, Attorney General's Office, Olympia, for Other Parties.
VAN DEREN, A.C.J.
¶ 1 Simpson Timber Company appeals the trial court's decision awarding Cindy Lewis workers' compensation benefits under the Industrial Insurance Act (IIA), Title 51 RCW, because of the injury she sustained from her exposure to a toxic agent at a Simpson work site. It argues that the trial court erred when it: (1) required Simpson to present its evidence to the jury first, even though Lewis had the burden of proof; (2) erroneously instructed the jury; (3) failed to grant Simpson's motions for judgment as a matter of law; and (4) made numerous erroneous evidentiary rulings. Holding that the trial committed no reversible error, we affirm.

*183 FACTS

I. Background
¶ 2 Simpson manufactures lumber in a production line. Rough lumber is brought to the line and initially fed into a planer. Thereafter, the lumber is sprayed with fungicide to prevent mold growth. Then it is sent through graders and trimmers, before it is finally wrapped in paper, tagged, and shipped as the final lumber product.
¶ 3 A vendor delivers the concentrated fungicide to Simpson and dilutes it with water to differing concentrations, depending on the type of wood being processed. The diluted fungicide is stored in the basement and piped up to the first floor, which houses the production line machinery. The fungicide is automatically sprayed onto the lumber by a spray box about four feet long, two feet wide, and five feet high.[1] The spray box has four nozzles that spray the lumber from both the top and the bottom as it passes out of the planer. In August 2002, Simpson changed the fungicide it was using to Mycostat-P and, around August 2003, it began using a similar fungicide called Mycostat-P20.
¶ 4 Lewis worked in an area of Simpson's plant known as the "north planer" or "east line" as a "clean up" worker. Administrative Record Trans. (AR Tr.) (Nov. 14, 2005) at 14-15.[2] She removed excess wood scraps and wood shavings from the main floor work area spanning between the planer and the trimmer and from the basement under this work area, but she was not responsible for any janitorial duties. Open slats on the main floor directed wood shavings and excess wood to the basement. Untreated wood fell to the basement before it went through the planer and treated wood fell from under the lumber grader. Lewis wore a hard hat, safety glasses, hearing protection, rubber gloves, work boots with ankle support, and coveralls.
¶ 5 Excess fungicide spray fell down from the main floor into the basement and dripped on Lewis. At times, her coveralls were soaking wet from the excess fungicide spilling into the basement. Simpson placed five gallon buckets under areas of the main floor with steady drips to catch the excess solution. Lewis was responsible for emptying the five gallon buckets back into the main chemical storage tanks in the basement.[3] On at least two occasions, the tanks overflowed and the diluted fungicide solution covered the basement floor to a depth of two to four inches. When the overflows occurred, Lewis put sawdust on the floor to absorb the solution and later disposed of the saturated sawdust.

II. Chemical Exposure and Occupational Disease
¶ 6 Lewis worked for Simpson for over 30 years. But, in August 2002, she began to experience unexplained symptoms. She had a rash on her arms and chest, bleeding ears, difficulty communicating with others, weight gain, bloody noses, pain when touching others, an asthma-like cough, and difficulty walking. She also experienced digestive problems, ringing in her ears, headaches, tingling under the skin, hallucinations, heart palpitations, and memory loss. In the middle to the end of 2003, she gained about 70 pounds, which she and others described as puffiness and water retention. She also had a marked decrease in energy. Before 2002, she worked two jobs, totaling approximately 75 to 80 hours per week. By the time of the administrative hearing, she was only able to work between 15 and 25 hours per week.
¶ 7 Lewis's coworkers noticed her weight gain, blotchy-looking skin, decreased energy level, lack of concentration, and occasional inability to formulate sentences quickly. Her husband corroborated her symptoms. Her coworkers experienced some skin and respiratory irritation during 2002 and 2003, but the symptoms usually subsided quickly, anywhere from immediately after removing *184 themselves from the chemical area to over the weekend away from the worksite.
¶ 8 Lewis reported her symptoms to her supervisor, and they filled out an accident report in April 2003. Her supervisor reassigned her to the chipper area, where the excess lumber and wood boxes are broken down into wood chips. At this assignment, she was exposed to treated wood, but not dripping solution. Lewis still experienced problems here so her supervisor assigned her as a clean up worker in the dry kiln department. In this position, she was not exposed to the fungicide solution or treated wood.
¶ 9 Still experiencing symptoms, Lewis quit working at Simpson Timber in August 2003. Since that time, her conditions have improved.[4] She has not gained more weight and has no bleeding in the ears, bloody noses, or rashes. Her skin no longer hurts when she is touched and her respiratory symptoms have improved. But she still feels as if she has asthma because, when she becomes ill, her symptoms persist for a much longer duration than they did previously. She still experiences problems with her memory, although she is able to communicate better. She testified that exposure to some smells causes her symptoms to worsen. Those smells are asphalt, gasoline or oil smells, vehicle exhaust fumes, and vehicle air fresheners. When she is exposed to gas fumes, her heart beats very quickly, and she becomes light-headed, dizzy, and tired.
¶ 10 Lewis has seen numerous physicians and a naturopath in an attempt to diagnosis her symptoms. Dr. David Buscher, one of her treating physicians, diagnosed her with solvent intoxication or toxic chemical exposure and Dr. Philip Ranheim, a physician Lewis saw for a second opinion, diagnosed her with toxic chemical exposure that developed into chemical sensitivity.[5] According to the depositions of four physicians who examined her, her physical exams and laboratory tests  with the exception of Buscher's laboratory tests  were often normal.[6] Three physicians opined that, more probably than not, her work at Simpson did not cause her symptoms, but two physicians opined that, more probably than not, her work at Simpson did cause her symptoms. Currently, Buscher prescribes oxygen therapy and organic sleeping pills for Lewis. At Buscher's direction, Lewis also puts four vials of unknown substance under her tongue in the morning and makes a drink from an unidentified powder to detoxify her body.

III. Procedural History
¶ 11 Lewis successfully submitted a workers' compensation claim to the Department of Labor and Industries (L & I). L & I found that she "sustained an injury or occupation[al] disease while in the course of employment with [Simpson]." Administrative Record (AR) at 99. It required Simpson to "pay all medical and time loss benefits as may be indicated in accordance with the industrial insurance laws." AR at 99. Simpson unsuccessfully requested that L & I reconsider the claim and time loss benefits. It then appealed L & I's decision to the Board of Industrial Insurance Appeals (BIIA).[7]
*185 ¶ 12 Simpson requested that the BIIA require Lewis to submit to a CR 35 physical examination.[8] Its motion requested that Lewis "undergo a mental examination," but also stated that "[t]he scope of the examination will consist of [Lewis's] physical disabilities, if any." AR at 133. The parties then agreed that Lewis would submit to a CR 35 examination by Dr. Anthony Montanaro, but that the examination would "be physical only, and that there [would] be no mental examination." AR at 149. Simpson also provided Lewis with all of the questions that it posed to the examiner before Lewis attended the examination.
¶ 13 Montanaro opined that Lewis was possibly suffering from depression. After the discovery deadline, Lewis proffered a psychological medical expert to rebut Montanaro's opinion, to which Simpson objected. The Industrial Appeals Judge (IAJ) ruled:
[A]ll testimony by any witness concerning an expression of psychiatric opinion about this claimant should be barred, because that was the agreement of the parties at the outset of this period of hearing preparation. That was the clause put in the order allowing the CR 35 exam in the first place. So even if not deliberate, if there were an expression of psychiatric opinion, that would be inconsistent with the posture of this case that all parties agreed to back then. Therefore ... [Simpson Timber's] motion will be granted and [Lewis's expert] shall not testify, nor shall any witness testify concerning an expression of psychiatric opinion about this claimant.
AR Tr. (Nov. 8, 2005) at 8-9.
¶ 14 During their depositions, however, Montanaro and Martin mentioned psychiatric conditions. In Lewis's closing motions and summation, she asked the IAJ to exclude portions of Martin's and Montanaro's testimony because they testified about Lewis's psychological conditions. In response, Simpson argued that the IAJ's ruling did not apply to Martin's testimony because it made the ruling after Martin had testified and Lewis had not objected to Martin's testimony. The IAJ excluded the portions of Martin's and Montanaro's testimony that referred to Lewis's possible psychiatric conditions, ruling that its previous "order applies to all medical witnesses, whether they were examined before or after that order. The exclusion arises from the posture of the case set by the parties' agreement, at motion hearing on July 27, 2005, that there will be no mental examination of the claimant in this case." AR at 18.
¶ 15 After Simpson presented its case in chief to the IAJ, Lewis attempted to admit photographs of her former work area at Simpson. Lewis obtained the photographs by going on to Simpson's property without permission the Thursday or Friday before her BIIA testimony, more than two years after she terminated her employment. Lewis admitted that the area differed from its appearance in 2003, when she last worked there, but she explained its differences.
¶ 16 Simpson objected to the photographs' admission because it did not receive timely notice of them; they were taken without its knowledge; no one from Simpson could review them; and they did not look like Lewis's 2003 work environment. Additionally, Simpson objected to exhibit 8, a photograph showing the door to the room where the diluted fungicide was stored, because it had a skull and cross bones and the words "Anger Danger" drawn onto it. AR Tr. (Nov. 21, 2005) at 53. It argued that the photograph was more prejudicial than probative. The IAJ excluded the photographs because (1) they were prejudicial, (2) Lewis took them after the conclusion of Simpson's case, and *186 (3) they did not illustrate Lewis's 2003 work environment.
¶ 17 The IAJ concluded that Lewis did not have an occupational disease that arose "naturally and proximately from the distinctive conditions of her employment" at Simpson and, therefore, L & I erred in allowing her claim and requiring Simpson to pay her time loss benefits. AR at 32. Lewis unsuccessfully appealed the IAJ's proposed decision and order, and the BIIA confirmed that decision and order as its final decision.
¶ 18 Lewis then appealed the BIIA's decision to the Mason County Superior Court and requested a jury trial. The trial court determined that the parties would read the witnesses' testimony in the order presented to the IAJ. It also excluded Martin's and Montanaro's opinions concerning Lewis's possible depression, but it allowed Lewis to admit the photographs of her former work place as exhibits 3 through 9 for demonstrative purposes only. Simpson unsuccessfully moved for a judgment as a matter of law after Lewis rested her case, after Simpson rested its case, and after the jury returned its verdict.
¶ 19 The jury found that the BIIA was incorrect in deciding that Lewis did not have an "occupational disease which arose naturally and proximately from the distinctive conditions of her employment at Simpson." Clerk's Papers (CP) at 18. Therefore, the trial court reversed and remanded the BIIA's decision, ordered it to allow Lewis's claim, and required Simpson to pay time loss benefits.[9]
¶ 20 Simpson appeals.

ANALYSIS
¶ 21 Simpson argues that the trial court erred when it: (1) required Simpson to present its evidence to the jury first, (2) erroneously instructed the jury, (3) failed to grant Simpson's motions for judgment as a matter of law, and (4) made numerous erroneous evidentiary rulings.

I. Standard of Review
¶ 22 "The IIA is the product of a compromise between employers and workers. Under the IIA, employers accepted limited liability for claims that might not have been compensable under the common law. In exchange, workers forfeited common law remedies." Cowlitz Stud Co. v. Clevenger, 157 Wash.2d 569, 572, 141 P.3d 1 (2006) (citation omitted). RCW 51.04.010 articulates this compromise, stating that "sure and certain relief for workers, injured in their work, and their families and dependents is hereby provided regardless of questions of fault and to the exclusion of every other remedy." In addition, we liberally construe the IIA "for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010. "All doubts about the meaning of the [IIA] must be resolved in favor of workers." Boeing Co. v. Heidy, 147 Wash.2d 78, 86, 51 P.3d 793 (2002).
¶ 23 Judicial review of a BIIA decision is de novo and is based solely on the evidence and testimony presented to the BIIA. Stelter v. Dep't of Labor & Indus., 147 Wash.2d 702, 707, 57 P.3d 248 (2002). Under the IIA, the BIIA's "decision is prima facie correct ... and a party attacking the decision must support its challenge by a preponderance of the evidence." Ruse v. Dep't of Labor & Indus., 138 Wash.2d 1, 5, 977 P.2d 570 (1999); see also RCW 51.52.115. "[E]ither party shall be entitled to a trial by jury upon demand" to resolve factual disputes. RCW 51.52.115. Furthermore, the trier of fact may disregard the BIIA's findings and conclusions if, even though there is substantial evidence to support them, it believes that other substantial evidence is more persuasive. Jenkins v. Dep't of Labor & Indus., 85 Wash.App. 7, 13, 931 P.2d 907 (1996). Our "`review is limited to examination of the record to see whether substantial evidence supports the findings made after the superior court's de novo review.'" Ruse, 138 Wash.2d at 5, 977 P.2d 570 (quoting Young v. Dep't of Labor & Indus., 81 Wash.App. 123, 128, 913 P.2d 402 (1996)).

*187 II. Order of Evidence and Burden of Production
¶ 24 Simpson argues that the trial court erred by requiring the parties to read the BIIA record to the jury in the order in which it was presented to the BIIA. Simpson prevailed before the BIIA, Lewis appealed the BIIA's decision, and, under RCW 51.52.115, she demanded a jury trial. She had the burden of proof at trial. RCW 51.52.115; see also Ruse, 138 Wash.2d at 5, 977 P.2d 570.
¶ 25 Because the hearing in the trial court is "de novo, but the court [does] not receive evidence or testimony other than, or in addition to, that offered before the [BIIA] or included in the record filed by the [BIIA] in the superior court," the procedure for presentation of evidence is unique. RCW 51.52.115. The jury does not read the BIIA's report of proceedings. Buffelen Woodworking Co. v. Cook, 28 Wash.App. 501, 503, 625 P.2d 703 (1981).
Instead, counsel for the litigants adopt unique "role playing" capacities and "read" their respective parts to the jury, in the same manner as they would when reading a witness' deposition. The jury is then informed that the [BIIA's] decision is presumed correct and the burden is on the appealing party to establish by a preponderance of the evidence that it is incorrect. Allison v. [Dep't] of Labor & Indus., 66 Wash.2d 263, 401 P.2d 982 (1965). After deliberation, the jury is requested to return a special verdict form evaluating the correctness of the disputed board findings.
Buffelen Woodworking, 28 Wash.App. at 503-04, 625 P.2d 703; see also Irene Scharf & William D. Hochberg, Workers' Compensation Practice, in 1A Kelly Kunsch, Washington Practice: Methods of Practice § 59.24, at 705-06 (4th ed.1997).
¶ 26 Generally, "[t]he right to open and close [a case] goes to the party having to sustain the burden of proof." Olympia Water Works v. Mottman, 88 Wash. 694, 697-98, 153 P. 1074 (1915); see also Wilson v. Overlake Hosp. Med. Ctr., 77 Wash.App. 909, 912, 895 P.2d 16 (1995); 75 Am.Jur.2d Trial § 276, at 511-12 (2d ed.2007); 75A Am. Jur.2d Trial § 445, at 34 (2d ed.2007). But the trial court may use its discretion to exercise its control over the trial. See ER 611.[10]
The order of proof at trial is intended to insure the orderly presentation of evidence and has no effect on the burden of proof or of going forward with the evidence. It is a rule of practice, not of law, and departures are allowed whenever the court considers them necessary to promote justice, so long as the trial court does not place the burden of proof on the wrong party.
75 Am.Jur.2d Trial § 276, at 511 (footnotes omitted). And ordinarily the order of presentation is of no consequence. See 75 Am. Jur.2d Trial § 276, at 511-12; Cf. Wilson, 77 Wash.App. at 912-13, 895 P.2d 16 (trial court did not abuse its discretion by allowing the defense to call a witness during the plaintiff's case).
¶ 27 We review the trial court's decisions on the order of evidence presentation for an abuse of discretion. See Wilson, 77 Wash.App. at 912-13, 895 P.2d 16. Here, the trial court concluded that the parties would present in the same order as they did before the IAJ because "[o]therwise, it will create a jumble, in that witnesses will be testifying about things that didn't yet happen." RP at 62.
¶ 28 We hold that the trial court properly instructed the jury that the findings of the BIIA were presumed correct and that Lewis bore the burden of proof at trial. See La Vera v. Dep't of Labor Indus., 45 Wash.2d 413, 414-15, 275 P.2d 426 (1954) (the trial court should not instruct the jury as to which party had the burden of proof at the BIIA). And the jury is presumed to follow the court's instructions. See Tiegs v. Watts, 135 Wash.2d 1, 29, 954 P.2d 877 (1998). Lewis retained the burden of persuasion. *188 The likelihood of jury confusion, if the trial court required the parties to read the record in a different order than how the parties presented the evidence at the BIIA, outweighed Simpson's argument that it was prejudiced by the order of presentation. Therefore, the trial court did not abuse its discretion by requiring the parties to read the record in its original sequence.

III. Jury Instruction 14
¶ 29 Simpson also argues that the trial court erred in providing the jury with instruction 14, asserting that this instruction misled the jury on the issue of causation.

A. Standard of Review
Jury instructions are reviewed de novo, and an instruction that contains an erroneous statement of the applicable law is reversible error where it prejudices a party. Jury instructions are sufficient when they allow counsel to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied.
Thompson v. King Feed & Nutrition Serv., Inc., 153 Wash.2d 447, 453, 105 P.3d 378 (2005) (citation omitted). "Even if an instruction is misleading, it will not be reversed unless prejudice is shown. A clear misstatement of the law, however, is presumed to be prejudicial." Keller v. City of Spokane, 146 Wash.2d 237, 249-50, 44 P.3d 845 (2002) (citation omitted). "In determining whether an instruction could have confused or misled the jury, the court examines the instructions in their entirety." Intalco Aluminum v. Dep't of Labor & Indus., 66 Wash.App. 644, 663, 833 P.2d 390 (1992).

B. Causation
¶ 30 A worker who has an occupation disease is entitled to receive compensation benefits under the IIA. RCW 51.32.180.[11] An occupational disease is a "disease or infection as arises naturally and proximately out of employment." RCW 51.08.140. To show that a worker's medical condition arises naturally out of employment, she:
must show that ... her particular work conditions more probably caused ... her disease or disease-based disability than conditions in everyday life or all employments in general; the disease or disease-based disability must be a natural incident of conditions of that worker's particular employment.
Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 481, 745 P.2d 1295 (1987). And a disease is proximately caused by employment conditions when "there [is] no intervening independent and sufficient cause for the disease, so that the disease would not have been contracted but for the condition existing in the ... employment." Simpson Logging Co. v. Dep't of Labor & Indus., 32 Wash.2d 472, 479, 202 P.2d 448 (1949).
¶ 31 "For [Lewis] to prove causation, the testimony of medical experts `must establish that it is more probable than not that the [exposure to chemicals at the work place] caused the subsequent disability.'" Grimes v. Lakeside Indus., 78 Wash.App. 554, 561, 897 P.2d 431 (1995) (quoting Zipp v. Seattle Sch. Dist. No. 1, 36 Wash.App. 598, 601, 676 P.2d 538 (1984)). And Division One of this court held that, under the IIA, "the claimant [is not required] to identify the precise chemical in the workplace that caused his or her disease" because we liberally construe the IIA and because "the claimant is only required to demonstrate that conditions in the workplace more probably than not caused his or her disease or disability." Intalco Aluminum, 66 Wash.App. at 658, 833 P.2d 390. In addressing the sufficiency of the evidence, it held:
A physician's opinion as to the cause of the claimant's disease is sufficient when it is based on reasonable medical certainty even though the doctor cannot rule out all other possible causes without resort to delicate *189 brain surgery. The evidence is sufficient to prove causation if, from the facts and circumstances and the medical testimony given, a reasonable person can infer that a causal connection exists.
Intalco Aluminum, 66 Wash.App. at 654-55, 833 P.2d 390 (citation omitted).
¶ 32 Here, jury instruction 14 stated:
The Worker's Compensation Act does not require the claimant to identify the precise chemical in the work place that caused his or her disease. However, evidence is not sufficient to prove causation unless, from the facts and circumstances and the medical testimony given, a reasonable person can infer that a causal connection exists.
CP at 43.
¶ 33 Simpson first argues that instruction 14 misstated Washington law because it did not instruct the jury that Lewis had to prove that a specific chemical existed in the workplace that she was exposed to and that caused her symptoms. Similar to the employer in Intalco Aluminum, Simpson "cites no authority for the proposition that [Lewis] must identify the specific causative agent responsible for [her] occupational disease," nor could we find any. 66 Wash.App. at 656, 833 P.2d 390.
¶ 34 Instruction 14 provides that Lewis need not "identify the precise chemical in the work place that caused ... her disease." CP at 43 (emphasis added). It instructs the jury that it must find or be able to infer a casual connection. The only reasonable interpretation of the jury instruction is that the cause of Lewis's symptoms must have arisen from a chemical or set of chemicals found in her workplace at Simpson.
¶ 35 The instruction was not misleading or a misstatement of law. Furthermore, taking the instructions as a whole, they allowed Simpson to argue its theory of the case. Instruction 11[12] informed the jury that medical testimony must support Lewis's medical conditions. Instruction 12[13] defined proximate cause in the context of the IIA and instruction 13[14] informed the jury that Lewis's occupational disease must arise naturally and proximately out of her employment. Read together, the trial court properly instructed the jury and it did not err.[15]

IV. Judgment as a Matter of Law
¶ 36 Simpson argues that the trial court erred when it denied its motions for *190 judgment as a matter of law because the evidence was insufficient for the case to reach the jury on the issue of whether Lewis's medical conditions were proximately caused by exposure to toxic substances in her work environment at Simpson.

A. Standard of Review
¶ 37 "We review the trial court's denial of [a] motion for judgment as a matter of law de novo, applying the same standard as the trial court." Davis v. Microsoft Corp., 149 Wash.2d 521, 530-31, 70 P.3d 126 (2003). "Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997); see also CR 50(a)(1).[16] Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the premise is true. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 176, 4 P.3d 123 (2000). The nonmoving party is "`not bound by the unfavorable portion of [the] evidence, but is entitled to have [the] case submitted to the jury on the basis of the evidence ... most favorable to [her] contention.'" Venezelos v. Dep't of Labor & Indus., 67 Wash.2d 71, 72, 406 P.2d 603 (1965) (internal quotation marks omitted) (quoting Dayton v. Dep't of Labor & Indus., 45 Wash.2d 797, 798-99, 278 P.2d 319 (1954)).

B. Denial of Judgment as a Matter of Law
¶ 38 In Lewis's IIA case, the medical testimony must have established that it was more probable than not that her exposure to chemicals at Simpson caused her occupational disability. See Grimes, 78 Wash.App. at 561, 897 P.2d 431. We give special consideration to Lewis's treating physician's opinion. But although the precise chemical need not be identified, testimony must establish that the presence of a toxin or combination of toxins in Lewis's work environment more probably than not caused her medical condition. Intalco Aluminum, 66 Wash.App. at 654-56, 833 P.2d 390. "Testimony that goes no further than to indicate that the injury might have caused the condition is insufficient; there must be some evidence of probative value that removes the question of causal relation from the field of speculation and surmise. If there is no evidence of causation beyond a possibility, it is error to submit the case to the jury." Zipp, 36 Wash.App. 598 at 601, 676 P.2d 538 (citation omitted).
¶ 39 It is undisputed that Mycostat-P and Mycostat-P20 were present at Simpson and that Lewis was exposed to them. Mycostat-P and Mycostat-P20 contain propiconazole, which is a fungicide used to prevent mold and fungus from growing on the timber. According to the experts' testimony, the material safety data sheet (MSDS),[17] showing a product's potentially hazardous substances, listed only that Mycostat-P and Mycostat-P20 contained propiconazole and other unidentified solvents.[18]
¶ 40 Simpson contacted Lee to conduct an evaluation[19] of the Mycostat-P and Mycostat-P20 products in relation to problems that welders and millwrights were having when they heated up the Mycostat product. As part of that review, Lee attempted to determine the unidentified solvents in the products. But he concluded that "one of the challenges [with his investigation] was that *191 [because of] the trade secret solvents that were used [in the Mycostat product, he] never found out exactly what they were." Thus, he attempted to determine what the solvents were by "using the best information that [he] had at the time[, which] was through searches on the Internet for other [MSDSs] and other information." Administrative Record Deposition (AR Dep.) of Lee at 15.
¶ 41 Lee reported that "[t]he solvents in Mycostat[-P]20 most likely included a mixture of mineral oil, petroleum (Stoddard) solvents, toluene, xylene, glycol ethers, and alcohols (commonly found in paints) based on a review of industry information." AR Dep. of Lee at 21. In explaining how he determined that xylene was present in Mycostat, he testified:
[DEFENSE COUNSEL:] Now, in assuming what the 80 percent of solvents for the Mycostat[-P]20, were you assuming that xylene was attached to that solvent?
[LEE:] I really have no idea what was in that. As I said earlier, from an agricultural website, they listed solvents that are used and blended with propiconazole. And all of them listed here, including xylene, were listed there. But I don't know whether xylene is in that product or not.
[DEFENSE COUNSEL:] Have you subsequently reviewed any material that would indicate whether xylene was present in Mycostat-P?
[LEE:] I have  I've never received any information from [the manufacturer] or anyone else to tell me that xylene is in it.
AR Dep. of Lee at 17-18. Lee also admitted that he did not know whether any of the other compounds that he suggested in his report actually were part of the Mycostat solutions. There was no testimony that xylene or toluene was used at Simpson. Robert Miller, a supervisor, testified that xylene was not used to dilute Mycostat, that he was never told that it was one of the product's solvents, and that he was not aware of Simpson using it anywhere at its facility.
¶ 42 Buscher, Lewis's treating physician, suspected that her symptoms were caused by something other than the fungicide, i.e., propiconazole, alone. When he first began treating Lewis, he was not aware that Mycostat contained any other harmful solvents because the MSDS sheet that he reviewed did not list any. He reviewed Lee's report and found it very significant because his "experiences told [him that] this woman was probably exposed to solvents [such as xylene and toluene], but the MSDS said no. So [he] was confused by that. [He] felt there was something missing, and [Lee's report] confirmed [his] previous suspicion" about his diagnosis of toxic exposure to solvents. AR Dep. of Buscher at 22. He also testified that it was Lewis's exposure to solvents that was important, but determining the specific solvent, whether it was xylene, toluene, or another solvent, was not as important to his diagnosis because "if you read a textbook of toxicology, you are going to find a little bit of difference with different solvents and what they do and how they metabolize. But basically they are pretty close [in] how they affect us."[20] AR Dep. of Buscher at 23. He concluded that "[m]ore probably than not, Ms. Lewis's health problems as described are due to exposures to toxic substances at work[, which] were most likely the solvents." AR Dep. of Buscher at 31.
¶ 43 Ranheim also testified that more probably than not Lewis's "exposure in the workplace caused the symptoms which [she] is experiencing and represents the basis of the injury that she has sustained." AR Dep. *192 of Ranheim at 22. While Ranheim testified that other factors beside toxic exposure could have explained all of Lewis's symptoms and none of his tests showed that she had chemical exposure, his opinion was informed by Lewis's self-reported symptoms and chemical exposure, and his review of other physicians' examinations of her. Ranheim admitted that it is helpful to know what chemical or chemicals to which the patient was exposed, and the patient's exposure rate to those chemicals, to evaluate a diagnosis, but he testified that physicians must take into account the individual characteristics of the patient, stating, "[i]t's not the dose [that] makes the poison. It's the dose plus the host." AR. Dep. of Ranheim at 27. But Ranheim testified that Lee's report, which stated the possible solvents found in the Mycostat solutions, influenced his medical opinion, even though the manufacturer did not supply him with any such information, and he testified that his opinion would have been affected if Mycostat contained only a fungicide and water. Burton, Martin, and Montanaro testified that, more likely than not, Lewis's symptoms were not related to workplace exposure to toxic chemicals. Montanaro also testified that the fungicide, propiconazole, in Mycostat is "quite frequently [used in medicine] in treating fungal diseases. So we don't expect to see any problems in most patients who are exposed to them since we actually have patients taking them in high dose by mouth on a routine basis." AR Dep. of Montanaro at 27.
¶ 44 These doctors also testified that, even if Lewis were exposed to xylene, it would not cause the symptoms that Lewis complained of after she stopped working at Simpson. First, Martin and Burton testified that xylene is usually rapidly absorbed and rapidly eliminated, so the effects of xylene exposure would be short-lived. And because Lewis's symptoms were long lasting and persisted after she was no longer exposed to the chemicals, they all believed that the chemicals she was exposed to at Simpson did not cause her symptoms. Martin and Burton also testified that, if her symptoms were the result of xylene exposure, she would have had to have been exposed to a great amount of the chemical to sustain cognitive injury or brain injury, and she likely would have been rendered unconscious from such high levels of xylene exposure.
¶ 45 But Buscher testified that not all individuals respond to solvent exposure in the same way. He explained that sensitivity levels are based on a bell-shaped curve, and that Lewis's body had a reaction that is at the end of the curve, an outlier. He also explained that Lewis's sensitivity was compounded by being exposed to multiple toxins, that her body could not break down as easily, because, when a person is "exposed to more than one of these solvents, they inhibit the metabolism of the other one." AR Dep. of Buscher at 16.
¶ 46 When viewing the evidence in the light most favorable to Lewis, the nonmoving party, we cannot say, as a matter of law, that the evidence is not substantial or that there is no reasonable inference to sustain the verdict for Lewis. See Sing, 134 Wash.2d at 29, 948 P.2d 816. Lee's, Ranheim's, and Buscher's testimony provides sufficient evidence to persuade a fair-minded rational person that a combination of toxic chemicals was present in Lewis's workplace and that those chemicals caused her medical symptoms based on her individual reaction to them. See Wenatchee Sportsmen Ass'n, 141 Wash.2d at 176, 4 P.3d 123. Therefore, the trial court's denial of Simpson's motions for judgment as a matter of law was not erroneous.

V. Evidentiary Rulings
¶ 47 Simpson further argues that the trial court erred in excluding a portion of Martin and Montanaro's expert testimony and in admitting the photographic exhibits 3 through 9.

A. Standard of Review
¶ 48 We review the trial court's evidentiary rulings for an abuse of discretion. City of Spokane v. Neff, 152 Wash.2d 85, 91, 93 P.3d 158 (2004). The trial court abuses its discretion when its "decision is `manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006) (quoting Associated Mortgage *193 Investors v. G.P. Kent Const. Co., 15 Wash.App. 223, 229, 548 P.2d 558 (1976)). "[I]f the trial court relies on unsupported facts or applies the wrong legal standard," its decision is exercised on untenable grounds or for untenable reasons; and "if `the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take,'" the trial court's decision is manifestly unreasonable. Mayer, 156 Wash.2d at 684, 132 P.3d 115 (internal quotation marks omitted) (quoting State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003)). The appellant "bears the burden of proving that the trial court abused its discretion." Childs v. Allen, 125 Wash. App. 50, 58, 105 P.3d 411 (2004).
The trial court, when conducting a de novo trial of an appeal from the [BIIA], acts in an appellate capacity and is entitled to independently resolve questions relating to the admission of evidence. However, it may consider only evidentiary issues that are objected to at the hearing below on the same grounds and preserved in the record. This requirement ensures that a party offering evidence has an opportunity to cure any defects and that an appellate tribunal has a record that permits resolution of all issues.
Ruff, 107 Wash.App. at 295, 28 P.3d 1 (footnotes omitted); see also Intalco Aluminum, 66 Wash.App. at 663, 833 P.2d 390.

B. Exclusion of Simpson's Expert Testimony about Depression and Causation
¶ 49 Simpson argues that the trial court erred in excluding Martin's and Montanaro's testimony about Lewis's possible psychiatric disorders, particularly that depression may have been causing Lewis's symptoms. Simpson objected to this exclusion before the IAJ and the trial court.
¶ 50 The parties agreed that Lewis would submit to a CR 35 examination conducted by Montanaro, but that the examination would "be physical only, and that there [would] be no mental examination." AR at 149. When, after physically examining Lewis, Montanaro opined that Lewis's symptoms might have been the result of depression, Simpson sought to amend its witness list to include a neuropsychologist to testify about Lewis's psychological conditions. The IAJ excluded the testimony based on the prior agreement.
¶ 51 In arguing to the trial court to allow this testimony, Simpson argued that these doctors opined that when a physical examination of Lewis yielded no diagnosis, "it's kind of an either/or. Either it's a toxic insult to the central nervous system or it's a derangement of the central nervous system not caused by a physical process, which leaves you with kind of a psychological differential by exclusion." RP at 36. But Simpson conceded that it did not explicitly make this argument to the IAJ. And the trial court "may consider only evidentiary issues that are objected to at the [BIIA] hearing below on the same grounds and preserved in the record." Ruff, 107 Wash.App. at 295, 28 P.3d 1 (footnote omitted). Furthermore, the doctors' testimony did not clearly establish this method of diagnosis.
¶ 52 The trial court concluded:
Well, the Court will affirm the ruling that was made by [the IAJ]. The parties apparently had an opportunity to argue back in August of '05 with regard to an examination that was upcoming, a CR 35 examination. And the ruling, either by agreement or after the argument, was that there would be no mental examination to be done.
And flowing from that, then, was [an independent medical examination] report of Dr. Montanaro. The concerns that were raised in that [caused] the claimant to seek the services of Dr. Powell, who then was not allowed to testify because that would be a neuropsychologist and doing essentially a medical examination. And at the point that [the IAJ] made his clarification ruling in ... November of '05... that there would in addition be no expression of psychiatric opinion, that that was an appropriate follow up.
Because in hindsight, perhaps in a search for the truth, all of it should have been opened up and dealt with. But at the point where we are here today, it would be only telling one side of the story to permit the self-insured to get before the jury certain *194 information that would not be able to be countered, for example, by Dr. Powell.
Report of Proceedings (RP) at 51-52.
¶ 53 Here, the trial court arguably considered an evidentiary issue that was objected to below on different grounds. But the trial court did not rely on unsupported facts, apply the wrong legal standard, or adopt a view that no reasonable person would take in deciding to exclude the evidence. See Mayer, 156 Wash.2d at 684, 132 P.3d 115. Therefore, the trial court did not abuse its discretion by excluding Martin's and Montanaro's opinion about Lewis's possible depression.[21]

C. Trial Court's Admission of Photographs
¶ 54 Simpson argues that the trial court erred in admitting the photographs, marked as exhibits 3 through 9, even as only demonstrative evidence, because (1) Lewis trespassed on Simpson's property in order to take the photographs, (2) the photographs were introduced after the discovery deadline and after Simpson had completed its case in chief, and (3) exhibit 8 was unduly prejudicial in depicting a skull and cross bones on the door to the chemical room. We review the trial court's decision to admit evidence only for demonstrative purposes for an abuse of discretion. See Jenkins v. Snohomish County Pub. Util. Dist. No. 1, 105 Wash.2d 99, 107-08, 713 P.2d 79 (1986).
¶ 55 The trial court did not determine whether Lewis trespassed, but it held that it could not find any case law for the proposition that such actions would exclude the evidence discovered as a result of the trespass. Secondly, the trial court found that, even though there was a discovery deadline violation, Lewis did not know the extent to which Simpson witnesses would testify about the layout of the workplace. And finally, the trial court held that Lewis properly authenticated the photographs and described the differences between how her former workplace appeared in the photographs and how it appeared when she worked there.[22] Therefore, the trial court admitted the photographs for demonstrative purposes only.
¶ 56 The jury could not use the exhibits admitted for demonstrative purposes as the basis to prove any claim. See Pers. Restraint of Woods, 154 Wash.2d at 426-27, 114 P.3d 607; Matsushita Elec. Corp. of Am. v. Salopek, 57 Wash.App. 242, 248, 787 P.2d 963 (1990); State v. Barr, 9 Wash.App. 891, 895, 515 P.2d 840 (1973). Furthermore, we encourage the use of demonstrative evidence "if it accurately illustrates facts sought to be proved." Jenkins, 105 Wash.2d at 107, 713 P.2d 79. And the foundation requirement for illustrative material is less onerous than the foundation requirement for other exhibits. See Matsushita Elec., 57 Wash.App. at 247-49, 787 P.2d 963; 5D Karl B. Tegland, Washington *195 Practice: Courtroom Handbook on Washington Evidence ch. 5, at 209 (2007-08 ed.2007).
¶ 57 We review the trial court's evidentiary decisions only for an abuse of discretion. See Neff, 152 Wash.2d at 91, 93 P.3d 158. The trial court admitted the photographs, "for demonstrative purposes only," because it thought they would assist the jury in understanding Lewis's work area. RP at 71. Lewis described the differences between her work environment in 2003 and how it appeared in the photographs. Furthermore, the trial court reasoned, some of the photographs indicated that Simpson had not altered some aspects of Lewis's former work area at all. The trial court did not rely on unsupported facts, apply the wrong legal standard, or adopt a view that no reasonable person would take when it admitted exhibits 3 through 9 only for demonstrative purposes. See Mayer, 156 Wash.2d at 684, 132 P.3d 115. Therefore, the trial court did not abuse its discretion in admitting them for demonstrative purposes.

VI. Attorney Fees
¶ 58 Lewis asks us to award her attorney fees.[23] The award of attorney fees in BIIA appeals is controlled by RCW 51.52.130[24] and "[t]he statute encompasses fees in both the superior and appellate courts when both courts review the matter." Hi-Way Fuel Co. v. Estate of Allyn, 128 Wash.App. 351, 363-64, 115 P.3d 1031 (2005). The statute allows the court to fix attorney fees if the court reverses the BIIA's order and grants an award to the disabled worker. RCW 51.52.130. Because we affirm the jury's verdict reversing the BIIA and Lewis prevails, we grant her reasonable attorney fees and costs in an amount to be determined according to RAP 14[25] and 18.1[26] upon her compliance with those rules. We affirm.
We concur: QUINN-BRINTNALL and PENOYAR, JJ.
NOTES
[1] Simpson used 60 to 80 gallons of the diluted solution per hour.
[2] The administrative record transcript is the transcript of the hearings before the Board of Industrial Insurance Appeals (BIIA). The pages are not sequentially numbered throughout all of the hearings, nor are the dates of each hearing sequentially numbered.
[3] Lewis's coworkers often dumped the buckets out for her.
[4] Although on April 15, 2005, she called her physician, Dr. David Buscher, and told him that she was starting to experience severe symptoms again.
[5] Buscher's laboratory tests revealed that she was allergic to molds, dust mites and some foods, but Dr. Anthony Montanaro's (who conducted the CR 35 evaluation) laboratory tests did not reveal that Lewis had any allergies. Buscher also tested her for chemical sensitivity and tested her urine, where he found elevated levels of mercapturic acid, which, according to Buscher, is a byproduct that the body excretes when it breaks down toxic materials.
[6] The BIIA considered the depositions of Laurence Lee, a certified industrial hygienist, who conducted an industrial hygiene evaluation for Simpson, and five physicians  Brent Burton, David Buscher, Thomas Martin, Anthony Montanaro, and Philip Ranheim. Burton performed an independent evaluation of Lewis's medical records on Simpson's behalf. Buscher is one of Lewis's treating physicians. Martin examined Lewis at the request of another one of her treating physicians, not specifically for the course of litigation. Montanaro conducted an independent evaluation of Lewis by court order under CR 35. Lewis wanted a second opinion as to her condition so Ranheim also evaluated her.
[7] Initially, an Industrial Appeals Judge (IAJ) dismissed Simpson's appeals because it reasoned "that the Department orders were interlocutory and therefore not subject to appeal." AR at 129. Thereafter, L & I allowed the claim. The BIIA vacated the initial IAJ's proposed decision and order and remanded the case for further proceedings.
[8] CR 35(a)(1) provides:

When the mental or physical condition ... of a party ... is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician, or mental examination by a physician or psychologist or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.
[9] The parties agreed not to submit the issue of time loss benefits to the jury.
[10] ER 611(a) provides:

The court shall exercise reasonable control over the mode and order of integrating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
[11] RCW 51.32.180 provides in relevant part:

Every worker who suffers disability from an occupational disease in the course of employment under the mandatory or elective adoption provisions of [the IIA], shall receive the same compensation benefits and medical, surgical and hospital care and treatment as would be paid and provided for a worker injured or killed in employment under [the IIA].
[12] Instruction 11 provided: "Any determination of the cause of Ms. Lewis' medical conditions must be supported by medical testimony. However, you may consider all of the testimony, both lay and medical, in evaluating the cause of Ms. Lewis' medical conditions." CP at 40.
[13] Instruction 12 provided:

"proximate cause" means a cause which in a direct sequence, unbroken by any new independent cause, produces the condition complained of and without which such condition would not have happened.
There may be one or more proximate causes of a condition. For a worker to be entitled to benefits under the Industrial Insurance Act, the occupational disease must be a proximate cause of the alleged condition for which entitlement to benefits is sought. The law does not require that the incident be the sole proximate cause of such condition.
CP at 41.
[14] Instruction 13 provided: "A state law defines an `occupational disease' as a disease or infection which arises naturally and proximately out of employment." CP at 42.
[15] Simpson also appears to argue that Lewis's theory of causation, toxic solvent intoxication, was not an accepted theory in the medical community. See e.g., Grant v. Boccia, 133 Wash.App. 176, 178-83, 137 P.3d 20 (2006), review denied, 159 Wash.2d 1014, 154 P.3d 919 (2007); Ruff v. Dep't of Labor & Indus., 107 Wash.App. 289, 295-305, 28 P.3d 1 (2001). But Simpson did not object to Buscher's testimony under ER 702 or Frye v. United States, 293 F. 1013, 54 App. D.C. 46 (D.C.Cir.1923). See State v. Gregory, 158 Wash.2d 759, 829, 147 P.3d 1201 (2006) (Washington courts have adopted the Frye test to determine when they may admit expert testimony concerning novel scientific evidence.); Ruff, 107 Wash.App. at 299-300, 28 P.3d 1. "When a party fails to raise a Frye argument below, a reviewing court need not consider it on appeal." In re Detention of Taylor, 132 Wash.App. 827, 836, 134 P.3d 254 (2006), review denied, 159 Wash.2d 1006, 153 P.3d 196 (2007). Because Simpson did not object to Lewis's theory of causation at trial, it may not now raise an evidentiary objection through its properly made jury instruction objection and we do not consider it. See Taylor, 132 Wash.App. at 836, 134 P.3d 254; Ruff, 107 Wash.App. at 295, 28 P.3d 1.
[16] CR 50(a)(1) provides in relevant part:

If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.
[17] A MSDS is a "[w]ritten, printed or electronic information (on paper, microfiche, or on-screen) that informs manufacturers, distributors or employers about the chemical, its hazards and protective measures." WAC 296-839-500.
[18] Our record does not contain any MSDSs.
[19] The IAJ and the trial court did not allow Lewis to admit Lee's report as evidence in support of her case, but both allowed Lee's deposition testimony.
[20] At oral argument, Simpson's counsel argued that a solvent could be water. But Simpson never cross-examined Buscher on this point. Rather, Simpson asked Buscher if he relied on Lee's report, to which he replied he, at least partially, had relied on the report. In response to Simpson's cross-examination, Buscher also stated, that if Lee's report was inaccurate or incomplete, "[i]t might" affect his opinion about the cause of Lewis's symptoms. AR Dep. of Buscher at 38. And on redirect examination, Lewis's counsel asked Buscher the following:

[CLAIMANT'S COUNSEL]: I want you to assume that Mr. Lee testified today in his deposition that although he didn't personally know exactly what was in this Mycostat-[P]20 product.... that the manufacture itself said that... 80 percent of the product was solvents.
[BUSCHER]: Uh-huh.
[CLAIMANT'S COUNSEL]: Does that change your opinion or add to your opinion in any way today?
[BUSCHER]: Just confirms it.
AR Dep. of Buscher at 52-53.
[21] On appeal, Simpson argues that the trial court should have allowed the jury to hear, at least, Martin's testimony about Lewis's possible depression because he was more like a treating physician and Lewis was not required to submit to his examination under CR 35. Therefore, it argues, the IAJ's ruling on the CR 35 examination could not apply to Martin's testimony. But, Simpson did not make this argument at the BIIA or in the trial court, and we will not consider it. See Martin v. Municipality of Metropolitan Seattle, 90 Wash.2d 39, 42, 578 P.2d 525 (1978); Ruff, 107 Wash.App. at 295, 28 P.3d 1. Further, the IAJ explicitly prohibited any witness from testifying about a psychiatric opinion.
[22] Although the trial court did not conduct an ER 403 balancing analysis about whether the probative value of the photograph showing the skull and cross bones on the door to the chemical room outweighed the potential prejudice, it did not err. Simpson argued to the IAJ that exhibit 8 was more prejudicial than probative. And at the beginning of counsels' argument on the admission of the photographs, the trial court noted that it "read something about a skull and cross bones, which is why [it] really wanted to look at the pictures to see if there was something unduly prejudicial." RP at 19. See Jenkins, 105 Wash.2d at 107, 713 P.2d 79 ("When demonstrative evidence ... is more prejudicial than probative, courts should refuse its admission."). But thereafter Simpson did not renew its objection to exhibit 8 based on ER 403, but focused its argument on Lewis's discovery deadline violation and trespass.

Simpson's strategy is akin to failing to renew an objection considered on a motion in limine. When the trial court grants a motion in limine to exclude evidence and that evidence is then presented at trial but the party fails to renew its objection, we will not review the claimed error. City of Bellevue v. Kravik, 69 Wash.App. 735, 742, 850 P.2d 559 (1993).
[23] Simpson does not request fees on appeal.
[24] RCW 51.52.130 provides in relevant part:

If, on appeal to the superior or appellate court from the decision and order of the [BIIA], said decision and order is reversed or modified and additional relief is granted to a worker or beneficiary, or in cases where a party other than the worker or beneficiary is the appealing party and the worker's or beneficiary's right to relief is sustained, a reasonable fee for the services of the worker's or beneficiary's attorney shall be fixed by the court.
[25] "Costs on review are determined and awarded by the appellate court which accepts review and makes the final determination of the case." RAP 14.1(b).
[26] RAP 18.1 authorizes the award of attorney fees on appeal where "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review."