# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DAVID L. DUNCAN, | No. 56663-0-II |
| Appellant, | |
| v. | |
| BOEING COMPANY, | UNPUBLISHED OPINION |
| Respondent. | |

CRUSER, A.C.J. – David Duncan was a Boeing employee and was exposed to Dinol, an anticorrosive chemical agent, on the job on February 5, 2015. Immediately upon exposure, Duncan experienced uncontrollable coughing and shortness of breath. He was seen by Boeing's medical department who performed a breathing test and sent him home with work restrictions.

Duncan was a 59-year-old lifelong smoker, but he maintains that he had suffered no respiratory symptoms aside from bronchitis up until the exposure. After the exposure, he was seen by several doctors. He was diagnosed with reactive airway disease as well as chronic obstructive pulmonary disease (COPD), a disease commonly associated with smokers.

On February 17, 2015, Duncan filed a claim with the Department of Labor and Industries (Department), which was accepted. The Department closed Duncan's claim on July 27, 2017, but it reversed that decision on September 6, 2017. The September 2017 order was then reversed by an Industrial Appeals Judge (IAJ) at the Board of Industrial Insurance Appeals (Board) who

directed the Department to find that Duncan was not entitled to time loss benefits between May 8, 2017 and July 27, 2017, and to close the claim without an award of permanent partial disability as of July 27, 2017. Duncan petitioned the Board for review, and the decision closing the claim was affirmed. The Board's main rationale was that Duncan's symptoms were caused by his smoking, and were exacerbated only temporarily by his chemical exposure and had long since ceased by July 27, 2017.

Duncan then appealed to Pierce County Superior Court, which held a jury trial. The jury affirmed the Board's decision affirming the closure of Duncan's claim. Duncan now complains that the court erroneously instructed the jury, that it allowed the parties to present testimony in the wrong order, that it erroneously admitted testimony of Duncan's coworker Dan Luu, and that it erroneously awarded attorney fees and costs to Boeing.

We hold that (1) the first challenged jury instruction did not mislead the jury or misstate the law, (2) the second challenged jury instruction was not an abuse of discretion, (3) the court did not abuse its discretion in altering the order of testimony from the order it was presented in before the Board, (4) admitting the testimony of Dan Luu was not an abuse of the court's discretion, and (5) the court did not err in awarding Boeing nominal attorney fees and costs.

## FACTS

### I. DUNCAN'S HISTORY

David Duncan was born in November 1955. Prior to working at Boeing, Duncan worked in real estate for one year, but did not find it lucrative enough to continue. Duncan also had experience working in automotive transmission repairs.

Duncan began smoking as a teenager, and smoked a pack a day for about 40 years, with some short breaks during that time. Despite being a smoker, he maintains that he had not experienced shortness of breath, nausea, wheezing, or coughing aside from the occasional cold. He was active, having chaperoned his son's Boy Scout troop on ten-mile hikes on Mount Rainier and Mount Pilchuck. However, he was prescribed Combivent, a bronchodilator inhaler, for previous bronchitis, and was previously diagnosed with COPD. He used the Combivent inhaler three to four times a day or "intermittently, prior to exercise." Clerk's Papers (CP) at 645.

Duncan began working with Boeing in 2007 as a plane mechanic. In Duncan's daily work, he used an aerosol called Dinol, which is an anticorrosive coating known as a "corrosion inhibitor compound" that dries into a hard, waxy substance. *Id.* at 471. Dinol is "used extensively in building airplanes." *Id.* at 573. Duncan's role was to apply Dinol to cover the areas of each plane that the quality assurance team had flagged. In order to apply Dinol, Duncan needed to lie down to reach narrow spaces.

## II. FEBRUARY 5, 2015 DINOL EXPOSURE

On February 5, 2015, Duncan was working inside the left wall of an aircraft applying Dinol in a confined space. A coworker named Dan Luu was in the same aircraft, about four feet away from Duncan when the exposure occurred. On that particular plane, "quality assurance had tagged 39 places" that needed Dinol application, so Duncan had a large area to cover. *Id.* at 470. The record is inconsistent on whether Duncan was wearing a mask at the time. Boeing's accident report "does not say specifically what the injuries were, but [Duncan's] lungs and skin were exposed." *Id.* at 575.

3

While working with Dinol, Duncan experienced immediate shortness of breath and uncontrollable coughing. He felt suffocated and like he couldn't breathe. Within five or ten minutes of breathing Dinol, his "windpipe had closed up and was contracting and burning." *Id.* at 483. Dan Luu led Duncan out of the aircraft, and Duncan approached his manager Lynn Hilman and told her he needed to see the medical office.

When Duncan went to Boeing Medical, he was sent home. After going home, his coughing worsened and he decided to find a private doctor. He also experienced decreased energy and drastic weight loss after the exposure, losing 10 to 15 pounds in the first three weeks and 25 pounds within the first couple of months.

Duncan saw Dr. Thomas Young, a naturopath, who diagnosed Duncan with chemical pneumonia and prescribed antibiotics. Dr. Young then referred Duncan to Dr. Arthur Knodel, a pulmonologist. Dr. Knodel concluded that Duncan:

> had an inhalation lung injury from the Dynol; that he had tobacco-induced COPD, predominately emphysema; that he had some kind of reactive airway disease. He also had interstitial lung disease. He had multiple pulmonary nodules in his lungs; and at that time nicotine dependant [sic].

*Id.* at 810. Dr. Knodel was concerned that the nodules may indicate cancer, and did not believe that they were related to his Dinol exposure. Dr. Knodel recommended that Duncan stop smoking, prescribed Albuterol as needed, ordered a positron emission tomography (PET) scan to screen for cancer, and recommended a follow-up pulmonary function test in three months.

4

In May 2015, Duncan was seen by Dr. Khaled Abdel-Rahman for an independent medical evaluation (IME). Dr. Abdel-Rahman examined Duncan and found that he "had rales[1] . . . but no wheezing." *Id.* at 577. Dr. Abdel-Rahman entertained the possibility of hypersensitivity pneumonitis and believed Duncan needed further evaluation, referring him for a CT scan and other testing. Upon the return of those test results, Dr. Abdel-Rahman diagnosed Duncan with irritant-induced asthma and concluded that the condition was possibly work-related. He recommended bronchodilators.

Two additional IMEs were performed in 2016, by Dr. Garrison Ayars, an allergy and immunology specialist, and Dr. Dennis Stumpp, an occupational medicine physician with toxicology experience. Dr. Ayars conducted an IME of Duncan in April 2016, to determine if his "occupational injury had reached maximum medical improvement" and whether Duncan was "capable of reasonably continuous gainful employment." *Id.* at 592-93. Dr. Ayars examined Duncan's lungs and found "a few expiratory rhonchi, which are harsh sounds. But there was no wheezing like you have with asthma typically, when it's significant, or rales when you get fluid in your lungs." *Id.* at 592. Dr. Ayars diagnosed Duncan with non-work-related COPD and concluded that he did not have any work-related lung disease. He found no evidence to support Dr. Abdel-Rahman's theory of hypersensitivity pneumonitis.

Dr. Stumpp conducted an IME of Duncan in November 2016. Like Dr. Ayars, Dr. Stumpp diagnosed Duncan with COPD and concluded that Duncan did not have a temporary exacerbation of any underlying condition as a result of the exposure. He disagreed with any diagnosis of reactive

---

[1] Rales are abnormal sounds heard accompanying the normal respiratory sounds on auscultation of the chest. MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/rale (last visited April 14, 2023).

airway disease and pneumonitis. He also concluded that any Dinol reaction "would be a very self-limited reaction lasting several hours to at most a day or two following the exposure" and that it would not have explained Duncan's symptoms. *Id.* at 705.

After the exposure, Duncan stopped smoking for about four to eight weeks, and then resumed smoking at "a quarter pack[ or] half pack a day." *Id.* at 492. He was able to quit completely in mid-2017.

Duncan took two to three days off of work after the exposure. When he returned to work, he was prohibited from using Dinol and from being within 15 to 30[2] feet of Dinol. Duncan worked on light duty at Boeing until January 2017, performing such tasks as tool kit preparation. Even in his light-duty role, "Duncan was reexposed to dry Dinol, [and] he had more shortness of breath." *Id.* at 579. He was not able to find a chemical-free position so was let go in a medical layoff in January 2017.

Duncan continued to experience symptoms after leaving Boeing, and was treated with pulmonary rehab in order to learn strategies to recover quickly when he loses his breath. His coughing and nausea have decreased, but he still experienced shortness of breath and wheezing as of 2018.

III. ADMINISTRATIVE BACKGROUND OF DUNCAN'S INDUSTRIAL INSURANCE CLAIM

On February 17, 2015, Duncan applied for benefits with the Department for his February 5, 2015 injury. In March 2015, the Department allowed Duncan's claim and decided that he was entitled to medical treatment for his work-related injury on February 5, 2015. On May 12, 2017,

---

[2] Duncan was also restricted, "at one time," from being within 100 feet of Dinol, but it is not clear from the record when that was put into effect. CP at 482.

the Department closed Duncan's claim, having decided that he no longer required treatment effective May 7, 2017. Duncan protested, and the decision to close the claim was affirmed on July 27, 2017. However, when Duncan protested again, the July order was reversed, and on September 6, 2017, the Department ordered Duncan's claim to remain open. Boeing then appealed the September 2017 order.

a. Hearing on Whether to Reverse September 2017 Order

The case was heard by an IAJ. The IAJ heard testimony from Boeing witnesses Julie Busch, a vocational rehabilitation counselor, and Dan Luu, a coworker of Duncan's. It then heard testimony from Duncan's witness Jeffrey Cockrum, a vocational expert, and Duncan himself. The IAJ also considered depositions of Boeing's medical experts Dr. Ayars and Dr. Stumpp, as well as Duncan's medical experts Dr. Gary Kiefer and Dr. Knodel.

The first Boeing witness, Busch, was a vocational rehabilitation counselor who discussed the job analysis of Duncan's role at Boeing. In forming her opinion, she considered the IMEs of Drs. Ayars and Stumpp. She interpreted both reports to support the conclusion that Duncan had smoking-related COPD but did not have a lung injury due to occupational chemical exposure. Busch also reviewed Dr. Abdel-Rahman's IME and Dr. Knodel's chart notes, but gave more weight to the IMEs of Drs. Ayars and Stumpp because in her opinion, they "both seemed to have real knowledge about chemicals and how they impact lungs and industrial exposure." *Id.* at 333.

Boeing witness Dan Luu, an electrician at Boeing, was a coworker of Duncan's, and a part of his team when using Dinol. Luu testified that when he worked with Dinol, he applied Dinol using a brush or sprayed it through a narrow tube to pinpoint where it was needed. He described using a small fan for ventilation and wearing goggles and a dust mask, but not a respirator.

Luu testified that he was working with Duncan on the same plane on February 5, 2015. He was working 20 to 30 feet away from Duncan, and was not paying attention to what Duncan was doing. He did not recall having conversations with Duncan during the February 5, 2015 incident.

Luu also testified that he had used Dinol daily, and continued to use it up until the time of testifying, without experiencing any problems or symptoms. Duncan's attorney objected, arguing that Luu's symptoms were not relevant to whether Duncan's claim should remain open as of 2017, and the Department joined in Duncan's objection. Shortly thereafter, however, Duncan's attorney asked Luu about whether he had a rash or other skin reaction from using Dinol, and whether other workers get such a reaction.

Duncan's witness Jeffrey Cockrum, a vocational counselor, testified that in his opinion, Duncan would not have been able to work in his old job at Boeing between May 7, 2017 and September 6, 2017. Before reaching this part of his testimony, Cockrum was asked on direct examination about a job analysis prepared by Julie Busch, who had testified the day before. Duncan's counsel mentioned Busch when introducing the exhibit, which had already been admitted, to Cockrum for him to view during his testimony. Additionally, Cockrum mentioned[3] Busch's testimony when clarifying a portion of counsel's question about a different vocational counselor, Anamaria Smith.

---

[3]  Q. All right. I believe, for the employer, Boeing, there was a different vocational counselor that conducted that vocational intake meeting on Boeing's behalf. I believe that counselor's name was Anamaria Smith; does that --
A. That does sound like the vocational counselor who completed the intake. Different than who?
Q. Oh, different than Julie Busch who testified yesterday for the employer?
A. Ah, okay. I did not know that Julie, Busch, maybe had, also, provided vocational services.
CP at 416.

When Duncan testified, he denied pre-exposure symptoms such as shortness of breath, nausea, wheezing, or coughing aside from the occasional cold. He also testified to his active lifestyle and mountain climbing with his son. Duncan further testified about his smoking history and that he quit briefly following the injury, then was able to ultimately quit in mid-2017. When discussing the February 5, 2015 exposure, Duncan's counsel asked him on direct examination, "I think, Mr. Luu mentioned a little, some kind of an attachment. Were you using that?" and Duncan responded, "No, sir." *Id.* at 470.

The IAJ considered the depositions of two Boeing medical experts: Dr. Ayars and Dr. Stumpp, both of whom prepared IMEs for Duncan's case in 2016. Dr. Ayars opined that Duncan "had exposure to Dinol reported on February 5, 2015, but I did not feel he had any evidence of a related lung disease or a problem related to that that was work-related." *Id.* at 594. He stated that Duncan "denied significant breathing problems prior [to the exposure], although he said that he had been given inhalers in the past for previous bronchitis, suggesting that maybe he had [such symptoms.]" *Id.* at 585-86. He further testified that Dinol "can be inhaled to make you dizzy, but it doesn't cause lung injury" and that the presence of nodules on Duncan's lungs "isn't consistent with Dinol exposure; that's incidentally related to his smoking." *Id.* at 597-98. Dr. Ayars testified that overall, Duncan's symptoms were more consistent with COPD than with asthma, and that Dinol is not known to cause symptoms, test results, or medication responses similar to those he observed in Duncan.

Dr. Stumpp similarly testified, "I thought he had chronic obstructive pulmonary disease which was preexisting and caused by the patient's long history of smoking. I didn't feel there was

any evidence it was permanently aggravated by the exposure of Dinol." *Id.* at 672. He went on to opine,

> What is surprising is for [Duncan] to suddenly say that he had respiratory complaints and he was perfectly fine prior to that. It's not unusual for somebody to have a long gradual onset of increasing shortness of breath with exertion with chronic obstructive pulmonary disease or for somebody to not really think about that until they get an acute infection, bronchitis, which then makes them acutely short of breath.
>      So like I say, the only surprising thing really is for him to have a single incident of exposure to a not particularly irritating thing and then after that to have continuing complaints of shortness of breath. Because, you know, the changes that are shown in his objective testing are changes that have been present prior to this event.

*Id.* at 683. Further, when discussing Duncan's post-exposure symptoms, Dr. Stumpp testified, "He actually did get better, but then he began complaining of chronic symptomatology and chronic shortness of breath with exertion." *Id.* at 721. On this basis, Dr. Stumpp was of the opinion that Duncan did not have a temporary exacerbation of any underlying condition as a result of the exposure.

Dr. Stumpp and Dr. Ayars both disagreed with Dr. Knodel's reactive airway dysfunction syndrome (RADS) diagnosis. Both Dr. Ayars and Dr. Stumpp distinguished RADS from the generic term reactive airway disease. at 714. Stumpp described reactive airway disease as "synonymous with asthma" and Ayars stated it was "a euphemism for asthma." *Id.* at 714, 623. Dr. Stumpp testified that RADS "involves exposure to extremely irritating substances . . . like chorine gas" and that Dinol, by contrast is "not particularly irritating." *Id.* at 681, 675. Similarly, Dr. Ayars testified that RADS syndrome occurs when "individuals get high-dosed toxic lung injury due to a caustic agent inhaled in the lungs. The classic is chlorine gas." *Id.* at 596-97. In Stumpp's opinion, Duncan "didn't have that kind of exposure to begin with." *Id.* at 681.

The IAJ also considered the depositions of Duncan's treating naturopath, Dr. Gary Kiefer, and his treating pulmonologist, Dr. Knodel. Dr. Kiefer testified as follows when asked if Duncan reported any pre-exposure symptoms:

> Well, he told me he was smoking for a long time which, you know, obviously a person can have symptoms from that as well, smoking. But, you know, smoking is one thing, but it seemed different. What he was dealing with was something much more acute.

*Id.* at 744. He was asked again whether Duncan had any history of shortness of breath and testified:

> Mr. Duncan is somewhat, in some ways -- I'm sure he has a way of speaking, a roundabout way of saying things, but I think that he's had previous exposures to [Dinol]. This isn't the first time he's been exposed to [Dinol].

*Id.* at 745. Additionally, when Dr. Kiefer was asked if he had reviewed depositions of Dr. Ayars and Dr. Stumpp, he responded "I've never seen anything like that." *Id.* at 786.

Dr. Knodel, Duncan's treating pulmonologist, noted that Duncan had a "significant . . . history of tobacco use" but that "it didn't seem to impact him much of [sic] his day-to-day activities." *Id.* at 807. Dr. Knodel went on to conclude that Duncan's lung nodules were not caused by Dinol.

The IAJ issued a Proposed Decision and Order recommending that the September 2017 order in favor of Duncan be reversed and remanded. The IAJ found that Duncan's February 5, 2015 Dinol exposure only "temporarily exacerbated" his symptoms, but that his work-related injury was "fixed and stable and did not need further proper and necessary treatment" as of July 27, 2017. *Id.* at 38-39. The IAJ also found that Duncan's COPD was not caused or aggravated by his Dinol exposure and that Duncan did not have reactive airway disease. The Order directed the Department "to find Mr. Duncan was not entitled to time-loss compensation benefits May 8, 2017,

through July 27, 2017, deny treatment, and close the claim without an award for permanent partial disability as of July 27, 2017." *Id.* at 39-40.

b. Board Review of IAJ Proposed Decision and Order

Duncan petitioned for Board review of the IAJ's recommendation, and the Board issued its final order agreeing with the IAJ, reversing the September 2017 order, and directing the Department to find that "Duncan was not entitled to time-loss compensation benefits from May 8, 2017, through July 27, 2017, and thereupon close the claim without an award for permanent partial disability as of July 27, 2017." *Id.* at 19.

Its factual findings included that "Mr. Duncan's COPD was not wholly asymptomatic prior to the exposures, inasmuch as he had been prescribed inhalers for bronchitis and he had been diagnosed with it before." *Id.* at 12. Correspondingly, it found that Duncan's COPD "arose prior to February 5, 2015, and was caused by smoking cigarettes." *Id.* at 18. Further, the Board found that Duncan's February 5, 2015 Dinol exposure "temporarily exacerbated his pulmonary symptoms." *Id.* at 17. It also found that "the preponderance of the medical evidence supports a finding that any such aggravation [caused by the February 5, 2015 exposure] was temporary and had long since resolved before the Department attempted to close the claim in May 2017." *Id.* at 12.

Regarding proximate cause, the Board reasoned that the February 2015 exposures were "no longer a proximate cause" of Duncan's illness. *Id.* at 13. It also found that:

> [t]he clear preponderance of the evidence does not support a finding that any lung or airway condition Mr. Duncan suffered from in 2017 was caused by his exposures to Dinol in February 2015. The sole proximate cause of his COPD, emphysema, chronic bronchitis, and right lung nodules has been his lengthy history of smoking. All four doctors have acknowledged that to some extent.

12

*Id.* Further, the Board reasoned that "[t]he continued, daily exposures to cigarette smoke constitute supervening causes that have broken the causal chain between his ongoing progressive lung conditions and the remote and limited exposures to Dinol and MPK at work in February 2015." *Id.*

The Board thus concluded that Duncan's claim was properly closed effective July 27, 2017. It concluded that Duncan did not meet RCW 51.32.090's requirements for temporary total disability for the time period between May 8, 2017 and July 27, 2017, meaning the industrial injury did not prevent him from performing and obtaining reasonably continuous gainful employment for the relevant time period. Therefore, Duncan was not entitled to time-loss compensation (wage replacement) for that time period. It further concluded that "Mr. Duncan's condition proximately caused by the industrial injury was medically stable as [of] July 27, 2017" and his conditions caused by the industrial injury required no further proper and necessary treatment, meaning he was entitled to no further cost-of-treatment benefits after that date. *Id.* at 18. Further, that Duncan did not meet RCW 51.32.080's requirements for permanent partial disability as of July 27, 2017.

One Board member dissented from the Board's majority decision, stating that "the weight of the evidence supports the Department's September 6, 2017 order directing that the claim be kept open." *Id.* at 19. The dissenting member emphasized that the opinions of attending physicians, who had concluded that his chemical exposure caused RADS and exacerbation of COPD, should be given special consideration.

IV. JURY TRIAL

Duncan appealed the Board's decision to Pierce County Superior Court, which held a jury trial.

a. Order of Evidence

During trial the evidence was read to the jury in a different order than it was presented to the Board.

Prior to the presentation of evidence to the jury, the parties discussed the order evidence would be presented to the jury. Duncan's counsel argued that "the way the evidence was presented to the [B]oard is the way that it should be presented to the jury." 1 Verbatim Report of Proceedings (VRP) at 67. Duncan's counsel argued that because Boeing's witnesses testified first before the board, that their testimony should be presented first to the jury. He expressed concern that jurors would be confused in the case that "witnesses refer to testimony that's developed" in a different order than was presented to them. *Id.* at 68.

Boeing's attorney responded that "since the plaintiff is presenting the evidence, they have the burden of going first." *Id.* at 70. He also stated that only once did one of Duncan's witnesses refer back to testimony from an earlier Boeing witness. He proposed that the testimony be read to the jury in the following order: Jeffrey Cockrum, David Duncan, Dr. Kiefer, Dr. Knodel, Dr. Ayars, Dr. Stumpp, Julie Busch, and Dan Luu.

The court asked the parties if they had authority for their arguments, and Duncan's counsel alerted the court to *Lewis v. Simpson Timber Co.*, 145 Wn. App. 302, 189 P.3d 178 (2008). The court decided to read the case and get back to the parties. The court ultimately sided with Boeing,

and Duncan's evidence was presented first and Boeing's evidence was presented second, which

was the opposite of how it was presented to the Board.

When evidence was presented to the jury, Duncan first presented the testimony of four

witnesses: Cockrum, Duncan, Dr. Kiefer, and Dr. Knodel. Boeing then presented four witnesses:

Busch, Luu, Dr. Stumpp, and Dr. Ayars.

b. Jury Instructions

The trial court's "Jury Instruction No. 15" instructed the jury:

> If you find that:
> (1) before the industrial injury, David Duncan had a bodily condition that was not disabling or requiring treatment; and
> (2) because of the industrial injury the pre-existing condition was lighted up or made active;
> then David Duncan is eligible for benefits for his full disability or need for treatment even though David Duncan's disability or need for treatment may be greater than it would have been for a person in the same circumstances without that pre-existing condition.
> A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this industrial injury.

CP at 919. This instruction is based on Washington Pattern Jury Instruction (WPI) 155.20

which sets out the following natural progression language as optional:

> [A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this [industrial injury] [occupational disease].]

6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 155.20
(7th ed. 2019) (italics omitted).

"Instruction No. 16" instructed the jury:

> If you find that:
> (1) at the time of the industrial injury, David Duncan had a bodily condition that was symptomatic or disabling; and

(2) because of the industrial injury the pre-existing condition was made worse;

then David Duncan is eligible for benefits for his full disability or need for treatment even though David Duncan's disability or need for treatment may be greater than it would have been for a person in the same circumstances without that pre-existing condition.

A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this industrial injury.

CP at 920.

The parties discussed these instructions in detail before the court arrived at its decision.

Duncan's counsel told the court,

My problem with this instruction is the way it's written. . . .

I have an issue with the WPI that I wanted to raise just for the record for appellate purposes because it's my position that if -- the jury instruction starts with "If you find that, before he had the injury, there was a condition that was not disabling or requiring treatment and, because of the injury, the preexisting condition was lighted up or made active" -- there is no reason to consider natural progression because they've ruled that out.

Because as soon as an industrial injury is a part of a need for treatment -- or the disability, then that condition is now treated under the claim.

4 VRP at 197. Boeing's counsel disputed this view of the law, and responded,

So the question is, what was the condition at that point in time? Was that simply the natural progression of his 35- to 40-year history of smoking that has put him where he's at, independent of the industrial injury.

And so the WPI, that's what it sets out, is that you have to look at -- when we are looking at this condition, around the time of the claim closure, is the industrial injury still a proximate cause of that condition?

*Id.* at 200. The court ultimately decided to follow the Washington Pattern Instructions and give the instructions in full, including the optional natural progression language. *Id.* at 202.

c. Jury Verdict

The jury answered "Yes" to both of the questions it was asked on its special verdict form, indicating that the Board was correct in deciding (1) "that as of July 27, 2017, Mr. Duncan's

pulmonary conditions proximately caused by the industrial injury were medically stable and did not require further proper and necessary treatment" and (2) "that from May 8, 2017, through July 27, 2017, the pulmonary conditions proximately caused by the industrial injury did not prevent Mr. Duncan from being able to perform and obtain gainful employment on a reasonably continuous basis." CP at 925.

Thereafter, Boeing was awarded $200 in attorney fees and $1,207.09 in costs, with a 12% interest rate.

## ANALYSIS

### I. STANDARD OF REVIEW

In industrial insurance cases, we review the superior court's decision, not the Board's order. RCW 51.52.140; *Dillon v. Dep't of Lab. & Indus.*, 186 Wn. App. 1, 6, 344 P.3d 1216 (2014). This court reviews the superior court's decision in the same way it reviews other civil cases. RCW 51.52.140. This includes reviewing jury instructions de novo and reviewing evidentiary rulings for abuse of discretion. *See Hudson v. United Parcel Serv., Inc.*, 163 Wn. App. 254, 261, 258 P.3d 87 (2011) (jury instructions); *Spohn v. Dep't of Lab. & Indus.*, 20 Wn. App. 2d 373, 379, 499 P.3d 989 (2021) (evidentiary rulings).

### II. JURY INSTRUCTIONS

Duncan argues that Jury Instruction No. 15, which was based on WPI 155.20 and dealt with preexisting *asymptomatic* conditions, misstated the law by including the optional natural progression language from the pattern instruction. He further argues that Instruction No. 16, which dealt with preexisting *symptomatic* conditions, should not have been given to the jury because the jury heard no evidence suggesting that Duncan had COPD symptoms prior to his exposure on

February 5, 2015. Boeing responds that both instructions were correct because Duncan had in 2005 been diagnosed with pulmonary nodules and emphysema via chest x-ray and CT scan, and had been prescribed with inhalers for bronchitis.

We hold that the court did not err in delivering Instruction No. 15 with the contested natural progression language included, because that language is legally accurate and not misleading. We also hold that the court did not err in delivering Instruction No. 16 because there was sufficient evidence in the record for a reasonable person to infer that Duncan's COPD was symptomatic prior to his Dinol exposure on February 5, 2015.

a. Legal Principles

We review the content of jury instructions de novo for legal accuracy. *Gerlach v. Cove Apartments, LLC*, 196 Wn.2d 111, 127, 471 P.3d 181 (2020); *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005). On the other hand, we review the decision to give a particular instruction, if based on a matter of fact, for abuse of discretion. *Lake Hills Invs., LLC v. Rushforth Constr. Co., Inc.*, 198 Wn.2d 209, 215-16, 494 P.3d 410 (2021). "A court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons." *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). "An abuse of discretion is found if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *Id.*

An erroneous jury instruction is reversible if it prejudices a party. *Joyce*, 155 Wn.2d at 323. " 'Prejudice is presumed if the instruction contains a clear misstatement of law[. However,] prejudice must be demonstrated if the instruction is merely misleading.' " *Lake Hills Invs.*, 198

18

Wn.2d at 216 (alteration in original) (internal quotation marks omitted) (quoting *Paetsch v. Spokane Dermatology Clinic, PS*, 182 Wn.2d 842, 849, 348 P.3d 389 (2015)). When an instruction misstates the law, the presumption of prejudice can be rebutted only by showing that the error was harmless. *Id.*

b. De Novo Review: Natural Progression Language in Jury Instruction No. 15

Duncan argues that including the optional natural progression language from the pattern instruction WPI 155.20 misled the jury and misstated the law. Our review of this claim is de novo. *Gerlach*, 196 Wn.2d at 127. The contested portion of the instruction stated, "A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this industrial injury." CP at 919. In Duncan's view, this language is inconsistent with Washington law governing the intersection between proximate cause and the lighting up doctrine.

In workers' compensation cases, an employee can be compensated when their disability has multiple proximate causes, one of which is the employee's preexisting condition and one of which is the workplace event. *Wendt v. Dep't of Lab. & Indus.*, 18 Wn. App. 674, 682, 571 P.2d 229 (1977). One application of this concept is the lighting up doctrine. *Miller v. Dep't of Lab. & Indus.*, 200 Wash. 674, 682-83, 94 P.2d 764 (1939). Lighting up occurs where the worker's employment has "made symptomatic the preexisting and previously quiescent or asymptomatic" condition. *Wendt*, 18 Wn. App. at 678. By contrast, lighting up cannot occur where the preexisting condition "was a naturally progressing condition that would have progressed to the same symptoms without the injury." *Zavala v. Twin City Foods*, 185 Wn. App. 838, 861, 343 P.3d 761

(2015). "Whether a given disability is the result of injury or solely of a preexisting infirmity is normally a question of fact." *Id.* at 862.

Natural progression can defeat a lighting up theory where the sole cause of a worker's disability is the natural progression of a latent, preexisting condition, rather than the workplace event. *See id.* at 861-62; *Austin v. Dep't of Lab. & Indus.*, 6 Wn. App. 394, 395-99, 492 P.2d 1382 (1971). For example, in *Zavala v. Twin City Foods,* the claimant challenged the trial court's decision to reject her lighting up theory when it found that her disability was the result of her naturally progressing arthritis and not proximately caused by her workplace injury. 185 Wn. App. at 862. Division Three of this court affirmed the trial court's decision because testimony was mixed and it was within the trial court's discretion to weigh the relevant evidence as part of its fact-finding discretion. *Id.* at 864.

WPI 155.20 instructs courts to use the bracketed natural progression language, which is the portion Duncan challenges here, "only if the evidence would support a finding that some of the disability resulted from the natural progression of the condition even without the industrial injury or work exposure." It further advises courts to provide additional instruction in cases where "there is medical testimony that an industrial injury or occupational disease proximately caused this otherwise natural progression to accelerate." *Id.*

Duncan argues that the language "forces an improper inference" by implying that lighting up and natural progression are mutually exclusive. Br. of Appellant at 16-17. We disagree. As *Zavala* shows, the factfinder has discretion to weigh conflicting evidence and determine whether a worker's disability is, at a particular point in time, solely proximately caused by a natural progression or is also caused by the worker's industrial injury. 185 Wn. App. at 864. The

20

instructions do not suggest a false dichotomy between natural progression and lighting up, but rather instruct the jury that workers cannot recover if their disability "resulted from the natural progression of the pre-existing condition *independent* of this industrial injury." CP at 919 (emphasis added). This language properly describes the nuance required by specifying only a natural progression that is *independent* from the industrial injury at hand will bar recovery. WPI 155.20. Thus, the jury instruction used in Duncan's case did not misstate the law or mislead the jury.

Duncan makes much of *Harbor Plywood*, a 1956 case in which the court held that the employee's industrial injury contributed to his death from cancer. *Harbor Plywood Corp. v. Dep't of Lab. & Indus.*, 48 Wn.2d 553, 557, 295 P.2d 310 (1956). But that case, like *Zavala*, hinged on the factual determination of whether the worker's disability was a proximate cause of their workplace injury. *Id.* Although the court stated in *Harbor Plywood* that "it is immaterial whether the infirmity *might possibly* have resulted in eventual disability or death, even without the injury," the case does not preclude factfinders from deciding that in a particular case, the underlying condition *actually did* result in the employee's later disability. *Id.* at 556-57. The jury instructions here were not incompatible with *Harbor Plywood*, as Duncan suggests they were. Thus, we hold that instruction 15 does not contain an error of law.

c. Abuse of Discretion Review: Jury Instruction No. 16

Duncan argues that the court abused its discretion by giving jury Instruction No. 16, which stated:

> If you find that:
> > (1) at the time of the industrial injury, David Duncan had a bodily condition that was symptomatic or disabling; and

(2) because of the industrial injury the pre-existing condition was made worse;

then David Duncan is eligible for benefits for his full disability or need for treatment even though David Duncan's disability or need for treatment may be greater than it would have been for a person in the same circumstances without that pre-existing condition.

A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this industrial injury.

CP at 920. He contends that the record contains no evidence showing he had COPD symptoms or treatment prior to his February 5, 2015 exposure. Boeing argues in response that the record contained evidence of Duncan's pre-exposure COPD symptoms including scans done in March 2005.

A preexisting condition that was symptomatic prior to the workplace event cannot have been lit up by the workplace event. *Zavala*, 185 Wn. App. at 862. However, a worker can still be entitled to benefits when a workplace event aggravates such a condition. *Ruse v. Dep't of Lab. & Indus.*, 138 Wn.2d 1, 7, 977 P.2d 570 (1999). "In an aggravation case, the employment does not cause the disease, but it *causes the disability* because the employment conditions accelerate the preexisting disease to result in the disability." *Id.*

Duncan denied having any pre-exposure symptoms. However, the medical expert testimony taken as a whole suggests that Duncan's COPD was caused by smoking, and a reasonable juror could infer that his COPD was symptomatic prior to the exposure. First, Dr. Ayars testified that Duncan "said he had been given inhalers in the past for previous bronchitis" and that "[h]e was using Combivent" which is a bronchodilator prescribed for bronchitis. CP at 585-86, 590. He also stated that in his review of Duncan's medical records, "[i]t said he had been diagnosed with COPD prior." *Id.* at 590. Dr. Ayars also testified that Duncan's symptoms were not work-

related and that the presence of nodules in March 2015 "isn't consistent with Dinol exposure; that's incidentally related to his smoking." *Id.* at 598.

Dr. Stumpp testified that Duncan "had a Combivent inhaler which he used only intermittently prior to exercise." *Id.* at 645. Dr. Stumpp cites to Dr. Ayars' medical report for the assertion that Duncan "says he was given inhalers in the past for previous bronchitis." *Id.* at 656. Additionally, Dr. Stumpp opined that Duncan's COPD "was preexisting and caused by the patient's long history of smoking." *Id.* at 672. Dr. Stumpp also found it "surprising" that a patient would "suddenly say that he had respiratory complaints and he was perfectly fine prior to that" because COPD more commonly presents as "a long gradual onset of increasing shortness of breath with exertion." *Id.* at 683. Further, Dr. Stumpp stated that "the changes that are shown in [Duncan's] objective testing are changes that have been present prior to this event." *Id.*

The record also contained opinion testimony from Dr. Kiefer and Dr. Knodel. Dr. Kiefer, Duncan's treating naturopath, did not give a clear answer when asked whether Duncan had any pre-exposure symptoms. Instead, he responded that "he told me he was smoking for a long time which, you know, obviously a person can have symptoms from that as well, smoking." *Id.* at 744. Dr. Knodel, Duncan's treating pulmonologist, noted that Duncan had a "significant . . . history of tobacco use" but that "it didn't seem to impact him much of [sic] his day-to-day activities." *Id.* at 807. Nonetheless, Dr. Knodel testified that he found a concerning nodule on Duncan's lung that he "could not blame on his exposure" and diagnosed him with "tobacco-induced COPD" alongside his diagnosis of reactive airway disease and inhalation injury from Dinol exposure. *Id.* at 814, 810.

Thus, the medical expert testimony taken as a whole suggests that Duncan's COPD was caused by smoking, and a reasonable juror could infer that his COPD was symptomatic prior to

the exposure. This is especially true given that prior to the exposure, he was prescribed an inhaler for bronchitis and was diagnosed with COPD. There is no indication that the trial court relied on unsupported facts or that it took an unreasonable view of the facts when deciding to give the instruction. *Gildon*, 158 Wn.2d at 494. Therefore, the court did not abuse its considerable discretion in deciding to instruct the jury on aggravation of symptomatic pre-exposure conditions.

Furthermore, Duncan must not only show that the trial court abused its discretion, but he must also show that he was prejudiced by the instruction. *Joyce*, 155 Wn.2d at 323. Duncan's briefing does not explain how he was prejudiced by Jury Instruction No. 16, even if the court erred by giving this instruction. There is no indication that the jury found that Duncan had a preexisting, symptomatic condition that was aggravated by his Dinol, given that its ultimate verdict was that the Board correctly closed Duncan's claim. Therefore, even if the court erred in giving the instruction, Duncan has not shown that the error is reversible.

## III. EVIDENTIARY RULINGS

Duncan argues that changing the order of evidence from what was presented to the Board is contrary to RCW 51.52.115, which forbids presenting evidence other than what the Board heard. He further argues that Dan Luu's testimony was irrelevant and that it prejudiced Duncan by inviting the jury to speculate on Duncan's symptoms based on Luu's experience working with the same chemicals. Boeing responds that the order of evidence was within the court's discretion and that Duncan failed to object to Dan Luu's testimony at the superior court.

We hold that it was not an abuse of discretion to alter the order of testimony from what was presented to the Board. We also hold that the court did not abuse its discretion by presenting

Dan Luu's testimony to the jury because it had a reasonable basis to find that the testimony was relevant.

a. Legal Principles

We review the superior court's evidentiary rulings in an appeal from a decision of the Board for abuse of discretion. *Spohn*, 20 Wn. App. 2d at 379. The superior court "abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons." *Spencer v. Badgley Mullins Turner, PLLC*, 6 Wn. App. 2d 762, 784, 432 P.3d 821 (2018).

b. Order of Evidence Presented

Duncan argues that the superior court erred when it changed the order of the presentation of evidence from what was presented to the Board. He argues that changing the order of the evidence makes it evidence other than what was presented to the Board, which is prohibited by RCW 51.52.115. He contends that presenting evidence out of order confuses the jury because witnesses refer back to prior testimony. Boeing responds that the court had discretion to control the order of evidence so long as it did not place the burden on the wrong party.

RCW 51.52.115 provides that the superior court, when reviewing a Board decision, "shall not receive evidence or testimony other than, or in addition to, that offered before the board." It goes on to provide that "the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same." *Id.* This means that here, because Duncan appealed the Board's decision, Duncan had the burden of proof before the superior court.

ER 611(a) provides that courts have the authority to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" to promote the goals of "ascertain[ing ]the truth," using time efficiently, and "protect[ing] witnesses from harassment or

undue embarrassment." The supreme court has noted that courts have broad discretion over "procedure[s] 'not regulated or covered by statute, formal rule or precedent.' " *Sanders v. State*, 169 Wn.2d 827, 851, 240 P.3d 120 (2010) (quoting *State v. Johnson*, 77 Wn.2d 423, 426, 462 P.2d 933 (1969)). Moreover, "[b]ecause the trial court has a duty to conduct the trial fairly, expeditiously and impartially, it has a corresponding power to adopt practices and procedures reasonably designed to secure such ends." *Johnson*, 77 Wn.2d at 426.

*Lewis v. Simpson Timber Co.* is the case the superior court appears to have relied on when deciding that it could change the order of testimony from what was presented to the Board. 145 Wn. App. 302. In that case, the employer appealed the trial court's decision awarding workers' compensation benefits to its employee, arguing in part that the court erred when it required the parties to read the record to the jury in the same order it was presented to the Board. *Lewis*, 145 Wn. App. at 308, 316. The employer complained that because it had the burden of proof, it should have been allowed to present its case first. *Id.* This court noted that customarily, the party with the burden of proof presents evidence first, but noted that " 'departures are allowed whenever the court considers them necessary to promote justice, so long as the trial court does not place the burden of proof on the wrong party.' " *Id.* at 317 (quoting 75 Am. Jur. 2d Trial § 276, at 511 (2007)). We therefore affirmed the trial court, reasoning that the trial court's decision avoided confusing the jury, and that benefit outweighed any risk of prejudice the order of evidence created. *Id.* at 318.

Duncan has identified three instances of a witness being asked to comment about testimony previously provided by another witness. First, Jeffrey Cockrum was asked to comment on Julie Busch's vocational report, and mentioned that she had testified the day before he did. Second, Duncan was asked to recall a portion of Luu's testimony regarding the attachment Luu used to

apply Dinol, and was asked whether he used the same attachment. Third, Dr. Kiefer was asked if he had reviewed depositions of Dr. Ayars and Dr. Stumpp, to which he responded "I've never seen anything like that." CP at 786. Our review of the record has revealed no further instance where a witness of Duncan's was asked to recall the testimony of a witness of Boeing's.

Although it is unusual for the superior court to alter the order of testimony from what was presented to the Board, we do not hold that this was an abuse of discretion. First, we reject Duncan's argument that presenting the testimony in a different order converts it to testimony other than what the Board heard. He has presented no authority to support such an interpretation. Second, the law grants trial courts significant discretion in managing the presentation of evidence in the interest of justice and efficiency. Third, the record here is essentially free from the type of interrelated testimony that posed a risk of confusion in *Lewis*. None of the three instances where Duncan's witnesses mentioned the prior testimony of Boeing's witnesses elicited anything noteworthy or that appears likely to have impacted the outcome. Thus, we cannot say as the *Lewis* court did that prejudice from confusing witnesses outweighs the court's interest in expeditious trial management. Based on the specific facts of this case, it was not an abuse of discretion to present Duncan's case first before the jury.

c. Admission of Dan Luu's Testimony

Duncan argues that a portion of Dan Luu's testimony was irrelevant because that testimony concerned the undisputed February 5, 2015 injury and not the need for continued medical treatment in 2017. Boeing responds that Duncan's counsel failed to object to the testimony "at any stage of the litigation." Br. of Resp't. at 12. Although it appears Boeing is incorrect on that point, we hold

that allowing Luu's testimony was not an abuse of discretion because the court had a reasonable basis to find that it was relevant to the issues before the jury.

Duncan's counsel objected to this portion of Luu's testimony before the Board[4] and renewed his objection before the superior court. The Board overruled the objection without explanation, but the superior court entertained thorough arguments from both sides as to the relevance of the testimony before deciding not to exclude the testimony. Before the superior court, Duncan's attorney argued that Luu's symptoms, if any, were irrelevant for two reasons: first, because Duncan's claim was already allowed, so the fact of the original exposure and injury was established; and second, because Luu's exposure does not have any bearing on whether Duncan's disability continued into the relevant time period in 2017. Boeing responded that Luu's lack of post-exposure symptoms, combined with the testimony of Dr. Stumpp and Dr. Ayars regarding the distinction between RADS syndrome and irritant-induced asthma, was relevant to which condition Duncan actually suffered and thus was relevant to whether Duncan's exposure-related symptoms were still present in 2017.

---

[4] The challenged testimony is as follows:

Q. You use Dinol daily?
A. Yes.
Q. Have you ever had any problems or symptoms from using it?
A. No.
MR. FELLER: Your Honor, at this point I believe -- we object as to relevance to Mr. Duncan's appeal at this point in time or the employer's appeal to Mr. Duncan. It's not relevant whether this witness had problems himself or his medical problems. It's more prejudicial than probative.
MS. ARAL-STILL: The Department joins.
JUDGE MCDONALD: Objection is overruled.

CP at 354.

Specifically, Dr. Stumpp and Dr. Ayars both disagreed with Dr. Knodel's RADS diagnosis. Both Dr. Ayars and Dr. Stumpp distinguished RADS from the generic term reactive airway disease. Stumpp described reactive airway disease as "synonymous with asthma" and Ayars stated it was "a euphemism for asthma." CP at 714, 623. Dr. Stumpp testified that RADS "involves exposure to extremely irritating substances . . . like chorine gas" and that Dinol, by contrast is "not particularly irritating." *Id.* at 681, 675. Similarly, Dr. Ayars testified that RADS syndrome occurs when "individuals get high-dosed toxic lung injury due to a caustic agent inhaled in the lungs. The classic is chlorine gas." *Id.* at 596-97.

The nexus between Dan Luu's testimony to the longevity of Duncan's disability hinges on the distinction between RADS and asthma. If Duncan's symptoms were caused by RADS, one would expect a severe exposure akin to the chlorine gas mentioned by both Dr. Ayars and Dr. Stumpp; and there is a reasonable inference that Dan Luu would have experienced symptoms from such an exposure as well. On the other hand, where Dan Luu had no symptoms, that suggests that Duncan's symptoms were not caused by RADS but by the milder reactive airway disease otherwise known as asthma. Because a reasonable connection exists between Dan Luu's testimony and the severity of Duncan's disability, admitting Luu's testimony was not an abuse of the trial court's discretion.

## IV. SUPERIOR COURT'S FEE AWARD

Duncan argues that RCW 51.52.130 precludes an attorney fee award payable to Boeing because Boeing is a self-insured employer. Boeing responds that RCW 4.84.010 allows the court to award it attorney fees as the prevailing party.

RCW 51.52.130(1) provides, "In the case of self-insured employers, the attorney fees fixed by the court, for services before the court only, and the fees of medical and other witnesses and the costs shall be payable directly by the self-insured employer." Under this provision, it is immaterial which party prevails; self-insured employers always must pay to litigate their own industrial insurance appeals. *See Oien v. Dep't of Lab. & Indus.*, 74 Wn. App. 566, 571, 874 P.2d 876 (1994) (refusing to award attorney fees to self-insured employer who successfully appealed superior court verdict).

By contrast, RCW 4.84.030 provides, "In any action in the superior court of Washington the prevailing party shall be entitled to his or her costs and disbursements." Although this statute appears to conflict with RCW 51.52.130(1), Division One of this court has noted that "these two provisions do not deal with the same kind of attorney fees." *Ferencak v. Dep't of Lab. & Indus.*, 142 Wn. App. 713, 729-30, 175 P.3d 1109 (2008). Although actual attorney fees are governed by RCW 51.52.130(1), RCWs 4.84.030 and 4.84.080 together allow courts to award a nominal attorney fee of $200 in such a case. *Id.* at 730; *Black v. Dep't of Lab. & Indus.*, 131 Wn.2d 547, 557-58, 933 P.2d 1025 (1997) (holding that RCW 51.52.140 allows an award of statutory attorney fees under RCWs 4.84.030 and .080). Similarly, litigation costs are allowed by RCW 4.84.010, .030, .090, and .190.

Therefore, we affirm the trial court's award of $200 in attorney fees and $1,207.09 in costs.

ATTORNEY FEES

Boeing requests attorney fees on appeal pursuant to RCW 51.52.130. However, it does not devote a section of its brief to this request as required by RAP 18.1(b). Instead, it adds a sentence

No. 56663-0-II

to the end of its section arguing that the Superior Court's fee award should be affirmed. Therefore, we deny Boeing's request for attorney fees and costs on appeal to this court.

CONCLUSION

We affirm the superior court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Cruser, J.

CRUSER, A.C.J.

I concur:

Price, J.

PRICE, J.

CHE, J. (concurring)—I concur with much of the majority's well-explained opinion, including its outcome. But I cannot agree with the majority's statement that a "preexisting condition that was symptomatic prior to the workplace event cannot have been lit up by the workplace event." Majority at 22 (citing *Zavala v. Twin City Foods*, 185 Wn. App. 838, 862, 343 P.3d 761 (2015)). This statement is too broad and inadvertently captures situations that are for the fact finder to decide.

If an industrial injury is a proximate cause of a disability, it is compensable regardless of whether the worker enjoyed perfect health. *Fochtman v. Dep't of Labor & Indus.*, 7 Wn. App. 286, 291, 499 P.2d 255 (1972). Workers' compensation jurisprudence recognizes a "multiple proximate cause" theory. *Wendt v. Dep't of Labor & Indus.*, 18 Wn. App. 674, 682-83, 571 P.2d 229 (1977). "A worker is entitled to benefits if the employment either *causes* a disabling disease, or *aggravates* a preexisting disease so as to result in a new disability." *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 7, 977 P.2d 570 (1999). If an industrial injury or occupational disease, "within the statutory meaning, lights up or makes active a latent or quiescent infirmity or weakened physical condition occasioned by disease, then the resulting disability is to be attributed to the injury, and not to the preexisting physical condition." *Miller v. Dep't of Labor & Indus.*, 200 Wash. 674, 682, 94 P.2d 764 (1939); *see* also *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 472, 745 P.2d 1295 (1987).

A lighting up instruction is appropriate where an industrial injury or occupational disease lit up or "made symptomatic the preexisting and previously quiescent or asymptomatic [] condition." *Wendt*, 18 Wn. App. at 678. "WEBSTER'S THIRD NEW INT'L DICTIONARY (1986) defines 'quiescent' as 'causing no symptoms' and 'asymptomatic' as 'presenting no subjective

evidence of disease.'" *McDonagh v. Dep't of Labor & Indus.,* 68 Wash. App. 749, 755, 845 P.2d 1030 (1993). *Webster's* defines "latent" as "not manifest" and "concealed, disguised." *Latent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (8th ed. 2002).

"A preexisting condition is not lit up if the weight of the evidence reveals that the condition was a naturally progressing condition that would have progressed to the same symptoms without the injury." *Zavala*, 185 Wn. App. at 861. "Whether a given disability is the result of injury or solely of a preexisting infirmity is normally a question of fact." *Id.* at 862.

To say that a "preexisting condition that was symptomatic prior to the workplace event cannot have been lit up by the workplace event" is too broad and unintentionally captures situations that fall into the fact-finder's determination whether the given disability is the result of injury or *solely* of a preexisting infirmity. Majority at 22 (citing *Zavala*, 185 Wn. App. at 862). In *Zavala*, Division Three discusses the trial court's citation to *Austin v. Department of Labor and Industries*, 6 Wn. App. 394, 398, 492 P.2d 1382 (1971) for the proposition that "a preexisting condition is not 'lit up' if the weight of the evidence reveals (1) that the condition was symptomatic before the workplace event, **or** (2) the condition was a naturally progressing condition that would have progressed to symptoms without the injury." *Zavala*, 185 Wn. App. at 862 (emphasis added).

In *Austin*, the sole question was whether there was sufficient evidence to present to a jury Austin's theory that the industrial injury made active or "lighted up" a preexisting condition. 6 Wn. App. at 396. The trial court declined to give Austin's proposed lighting up instruction based upon *Miller*:[5] "If an injury . . . lights up or makes active a latent or quiescent infirmity or

---

[5] *Miller*, 200 Wn. at 682.

weakened physical condition occasioned by disease, then the resulting disability is to be attributed to the injury, and not to the preexisting physical condition." *Austin*, 6 Wn. App. at 395. Division Three stated,

> From our review of the testimony, it is evident Dr. Grieve did not testify the preexisting condition was inactive before the injury **nor** that the injury 'lighted up' a latent condition. In our view, the evidence was insufficient to justify the giving of a 'lighting up' instruction and it was properly refused.

*Id.* at 399 (emphasis added).

The majority is correct that *Zavala* uses the word "or." However, as used in *Austin*, "nor" arguably, and respectfully, should be interpreted as "and," which would bring it in line with existing caselaw and the Washington Pattern Jury Instructions (WPI). WPI 155.20 is entitled, "Lighting Up of Pre-Existing, Asymptomatic Condition," and it is given when there is "a pre-existing condition that was not disabling or requiring treatment before the industrial injury or occupational disease on which the claim is based." WPI 155.20, note on use. WPI 155.20 (emphasis added) states:

> If you find that:
>
> (1)    before the *[industrial injury] [occupational disease]*, (worker's name) had a *[bodily] [mental]* condition that was not disabling or requiring treatment; **and**
>
> (2)    because of the *[industrial injury] [occupational disease]* the pre-existing condition was lighted up or made active.

6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 155.20 (7th ed. 2019).

In *Zavala*, Zavala argued that if she had no knee symptoms before the industrial injury, she was entitled as a matter of law to recovery and treatment for all symptoms thereafter, even if her preexisting condition contributed to her symptoms. 185 Wn. App. at 861. Division Three

stated, "[t]he law is not that helpful." *Id.* It went on to state, "[t]he trial court could have ruled in favor of Zavala, but we do not agree the trial court necessarily needed to rule for Zavala. Whether a given disability is the result of injury or solely of a preexisting infirmity is normally a question of fact." *Id.* at 862.

The definitions and case law above do not necessarily preclude coverage in situations where a body part was symptomatic at some point prior to an industrial injury or occupational disease, but then became asymptomatic, dormant, or went into a remission-type phase or resolved.[6] Aches and pains to any muscle, joint, or body part may come and go, especially for those longer-lived individuals. Each instance of an ache or pain does not necessarily indicate a disease or degenerative process or condition, but in certain circumstances, supported by medical expert testimony, it may.

Further, there is no prerequisite in the lighting up doctrine "that there be a 'diagnosed' or 'pre-existing' condition . . . [as] evidenced by the *Wendt* court's use of the terms 'quiescent or asymptomatic [] condition' to describe the condition held to mandate the lighting-up instruction." *McDonagh*, 68 Wn. App. at 755 (quoting *Wendt*, 18 Wn. App. at 678). While caselaw uses "preexisting" and "prior" in relation to time of condition or symptom, it does not

---

[6] WPI 155.21 Worsening of Preexisting, Symptomatic Condition should be used when a preexisting condition that was symptomatic or disabling at the time of the event on which the claim is based. When the evidence is disputed as to the existence of such pre-existing pain or disability, use both WPI 155.21 and WPI 155.20 (Lighting Up of Preexisting, Asymptomatic Condition). WPI 155.21 note on use. Duncan does not dispute the giving of a lighting up instruction. Instead, he disputes the inclusion of the optional natural progression language and giving the worsening of a preexisting, symptomatic condition jury instruction. He also disputes the giving of WPI 155.21 based upon a lack of evidence. As discussed in the majority opinion, there was substantial evidence to support giving both instructions and the optional natural progression language.

discuss frequency, severity, or how close in time a symptom or condition must be manifest or symptomatic for a court to give or decline to give a lighting up instruction. Therefore, a jury could find based upon the evidence that an individual's symptoms, decades or even months prior, occurring a few times prior or even once prior, with moderate or minor symptoms, may be related to the workplace event, may be related solely to a preexisting infirmity, or may be entirely unrelated to either the work place event or a preexisting condition.

The majority opinion's use of "cannot" in its overly broad sentence may work either an injustice or delay justice in the situations discussed above. Industrial insurance cases are heavily fact-specific and whether any given disability is the result of the industrial injury or occupational disease or *solely* of a preexisting infirmity is for the fact finder. *Zavala*, 1185 Wn. App. at 862.

The majority's statement, even tempered by its acknowledgment that "lighting up cannot occur where the preexisting condition 'was a naturally progressing condition that would have progressed to the same symptoms without the injury'" does not undo the potential damage by its later overly broad statement. Majority at 19 (quoting *Zavala*, 185 Wn. App. at 861).

Respectfully, I concur.

Che, J.
Che, J.